**NORTH CAROLINA FISHERIES AS-SOCIATION, INC. and Georges Seafood, Inc., Plaintiffs,**

v.

**Donald EVANS, Secretary of Commerce, Defendant.**

**No. CIV. A. 2:01CV149.**

United States District Court, E.D. Virginia, Norfolk Division.

Nov. 13, 2001.

---

Thomas S. Berkley, Mark S. Davis, Carr & Porter, Portsmouth, VA, Waverley L. Berkley, III, Norfolk, VA, for Plaintiffs.

Mark A. Brown, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Mark S. Brown, U.S. Attorney's Office, Alexandria, VA, George M. Kelley, III, Michael A. Rhine, U.S. Attorney's Office, Norfolk, VA, for Defendant.

## OPINION AND ORDER

FRIEDMAN, District Judge.

On October 3, 2001, this Court heard oral argument on cross-motions for summary judgment in this matter and took the motions under advisement. Based on the parties' memoranda, oral arguments, and for the reasons stated below, defendant's Motion for Summary Judgment is GRANTED and plaintiffs' Motion for Summary Judgment is DENIED.

### I. Background

#### A. Background on the Fishery Act

In 1976, Congress enacted the Magnuson Fishery Act, which was later amended to become the Magnuson–Stevens Act ("MSA"), in an effort to develop a management process that would conserve several species of fish for the benefit of the commercial and recreational [1] fishermen of the United States, rather than the foreign entities that had plundered these resources off our coasts. 142 Cong. Rec. H11418 and S10794 (Sept. 27, 1996, Sept. 18, 1996). In an effort to make the management process more efficient, Congress originally created eight regional fishery management councils composed of state fishery managers, the regional National Marine Fisheries Service ("NMFS") administrator, and qualified fishing industry academic and environmental representatives. 16 U.S.C. § 1852(a)(1) (2000). Each council has responsibility for the fisheries seaward of the states comprising it, with primary responsibility being development of a fishery management plan ("FMP") that establishes the rules for each fishery and meets national conservation and management standards established in the MSA. 16 U.S.C. § 1852(h) (2000). The councils' area of direct responsibility extends from three to two hundred miles off the coast of the United States (the Exclusive Economic Zone or "EEZ").

By 1996 the M.S.A. § had accomplished part of its original goal of protecting the fisheries from foreign plundering, but Congress also realized that there was a new crisis in fish stock conservation and a significant threat to domestic fishing families. 142 Cong. Rec. H11418, 11439 and S10794 (Sept. 27, 1996, Sept. 18, 1996). Therefore, Congress reviewed the status of the M.S.A. § and considered amending the process. As a result of this amending process, Congress enacted the Sustained Fisheries Act ("SFA"). 16 U.S.C. § 1854(a)(1); 50 C.F.R. § 600.310 (2000).

Under the improved MSA, the Secretary had the responsibility to ensure that FMPs submitted by councils to NMFS complied not only with the ten National Standards of the M.S.A. § but also with the new equality provisions of the SFA, 16 U.S.C. §§ 1851(a)(1–10), 1854(a)(1); 50 C.F.R. § 600.310 (2000). These new equal treatment provisions dictated that the conservation efforts proposed and promulgated by the NMFS allocate harvest restrictions fairly and equitably among the commercial, recreational and charter fishing sectors in the fishery. 16 U.S.C. §§ 1853(a)(14), 1854(e)(4)(B) (2000).

While the federal management scheme became firmly established, state governments along the eastern seaboard continued to monitor fisheries in waters from the coast to three miles offshore, pursuant to an interstate compact that established the Atlantic States Marine Fisheries Commission ("ASMFC") as its governing body. Pub.L. No. 77–539, 56 Stat. 267 (1942). In 1993, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act to, among other things, enable the ASMFC and the NMFS to cooperate in

---

1. Recreational summer flounder cannot be sold. 60 C.F.R. § 648.2 (2000).

the management of fisheries. 16 U.S.C. § 5101(a)(4), et. seq. (2000). While the ASMFC had the responsibility for developing FMPs for state waters, the migratory nature of the many managed species required NMFS and ASMFC to begin a cooperative relationship of establishing compatible FMPs for their respective jurisdictional limits. They designed the FMPs to control the total allowable landings ("TAL") of different species of fish by both recreational and commercial fishermen through a quota and harvest restriction process.

The Mid–Atlantic Fishery Management Council ("MAFMC"), one of the eight councils of the NMFS, first considered the development of a FMP for summer flounder (a.k.a.fluke) in the late 1970's. Because a significant portion of the summer flounder catch was taken from state waters, the MAFMC decided that the initial FMP should be prepared by the ASMFC. A state/federal draft of the FMP for summer flounder was adopted by the ASMFC in 1982, and then the MAFMC adopted a FMP in 1988 based upon the FMP prepared by the ASMFC. This FMP has been amended numerous times since then in order to achieve the intent of the MSA.

### B. Background on Amendment 2 to the Summer Flounder FMP

In 1992, the NMFS approved and adopted Amendment 2 to the Summer Flounder FMP, which was developed by the MAFMC and ASMFC. Amendment 2 created a rebuilding schedule for the flounder stock by requiring decreases in fishing mortality ("F") each year until the fishing mortality rate associated with the maximum yield per recruit[2] ("Fmax") is achieved. 57 Fed.Reg. 57,358 (Dec. 4, 1992). To attain the desired decreases in fishing mortality, Amendment 2 established procedures to set an annual, coast wide quota. This annual quota is split between commercial and recreational fisheries on a 60/40 percent basis, based on historical percentages caught by the two sectors.

For the commercial fisheries, Amendment 2 divides the 60 percent commercial share among fishers from individual states based on each state's share of commercial landings of summer flounder from 1980 through 1989. The regulations implementing Amendment 2 require that NMFS determine what overage has occurred on a state-by-state basis and that the overage, if any, be deducted from the following year's quota for the state. 50 C.F.R. § 648.100(d)(2) (2000). During the summer flounder fishing season, NMFS monitors the commercial quota by reviewing the dealer transactions in the form of weekly summaries provided by the summer flounder dealers from each state. 50 C.F.R. § 648.7 (2000). In addition, this data is compiled from real time monitoring of commercial fisherman via an Interactive Voice Response system ("IVR"), which requires them to report, on a weekly or daily basis, the following information: dealer permit number, dealer code, pounds purchased by species, reporting week, and state of landing for each species purchased. 50 C.F.R. § 648.7.

The recreational summer flounder fishery differs from the commercial fishery in several respects, and the NMFS's methods for monitoring the fisheries differs accordingly. Whereas the commercial fishery occurs largely (but not entirely) in the EEZ, the recreational fishery occurs largely in state waters. Amendment 2, 57 Fed. Reg. 57,358 (Dec. 4, 1992). Mandatory reporting requirements currently apply to the party and charter boat segment of the recreational fishery that fishes in the EEZ, but there is no reporting require-

---

**2.** A recruit is a summer flounder that has reached mature spawning age.

ment for recreational fishers in state waters. 50 C.F.R. 648.7 (2000). Additionally, because recreational summer flounder cannot be sold, there are no transactions with fish dealers and thus, a dealer-based reporting system is not possible. Therefore, the NMFS collects recreational fishery data through the Marine Recreational Fishing Statistics Survey ("MRFSS"), which consists of a series of surveys that is intended to obtain standardized and comparable estimates of participation, effort, and catch by recreational anglers in the marine waters of the United States. *See* Def. Mot. for Summ. J., Ex. 2. Unlike the commercial dealer-reporting system, MRFSS is not intended to provide in-season quota monitoring to close the recreational fishery when a particular recreational quota is attained. *See* Def. Mot. for Summ. J., Ex. 3. Rather, under the management system established by Amendment 2, recreational landings data is used as a tool to determine what non-quota management measures are necessary to constrain the recreational fishery from year to year.[3] Amendment 2, 57 Fed.Reg. 57,358 (Dec. 4, 1992); 50 C.F.R. § 648.100(b) (2000).

## C. Procedural Background

On January 29, 2001, the Secretary of Commerce issued an emergency rule setting forth the 2001 summer flounder quotas. Shortly thereafter, on February 28, 2001, North Carolina Fisheries Association, Inc. and Georges Seafood, Inc. (hereinafter "plaintiffs") filed a nine-count complaint against Donald Evans, the Secretary of Commerce (hereinafter "defendant"). On March 23, 2001, the defendant issued its final rule concerning the 2001 summer flounder quota. On April 20, 2001, plaintiffs filed a supplemental complaint, which contained only seven counts. In the mean-

time, plaintiffs also filed a Motion to Enforce the Court's Orders, which was heard by Judge Doumar on April 18, 2001 and a decided on July 30, 2001. *North Carolina Fisheries Ass'n v. Evans,* 152 F.Supp.2d 870 (E.D.Va.2001). Plaintiffs filed a motion for summary judgment on August 9, 2001. Defendant filed his response, along with a cross-motion for summary judgment, on September 5, 2001.

In Count one of their complaint, plaintiffs argue that the NMFS has failed to provide them with a timely adjusted quota for the 2001 summer flounder fishing season. As a result, plaintiffs contend they cannot determine how best to conduct their businesses and allocate their fishing effort for 2001 and beyond. By failing to publish the quotas in a reasonable time, plaintiffs argue the NMFS has acted arbitrarily and capriciously and abused its discretion.

In Counts two and three, plaintiffs allege that the current system utilized by the NMFS penalizes the commercial fishermen twice for overages, while the recreational fishermen are only penalized once. When the amount of fish caught exceeds the quota set by the NMFS for the year, regardless of whether the overage is caused by the recreational or commercial fishermen, the next year's quotas are reduced overall (penalizing both commercial and recreational fisheries alike). In addition, any commercial overage directly reduces the percentage of the TAL assigned to the commercial fisherman by requiring a "pay back" of their overage in the following years through a deduction of their share of the TAL. The recreational fishermen have no pay back requirement for their overages. Plaintiffs' argue that the practice of reducing the commercial quotas twice and recreational quotas once violates

---

**3.** NMFS constrains the recreational fishery by establishing a recreational fishing season and

adopting minimum fish sizes and trip limits each year.

the equitable and fair principles of the SFA and the MSA. 16 U.S.C. §§ 1853(a)(14) and 1854(e)(4)(B). In addition, plaintiffs argue that the NMFS has acted arbitrarily and capriciously, abused its discretion, failed to act in accordance with the law, acted outside the statutory limitations and acted without observation of procedure required by law in refusing to follow statutory mandate.

Counts four and five address the plaintiffs' contention that the different monitoring systems utilized by the NMFS for determining if the fisheries have exceeded the yearly quotas, specifically real time monitoring via IVR for the commercial fisheries and the MRFSS survey for the recreational fishermen, are inequitable and unfair and violate the SFA and 303 and 304 of the MSA, 16 U.S.C. §§ 1853(a)(14) and 1854(e)(4)(B). In addition, plaintiffs argue that the NMFS has acted arbitrarily and capriciously, abused its discretion, failed to act in accordance with the law, acted outside the statutory limitations and acted without observation of procedure required by law in refusing to follow statutory mandate.

In Count six, the plaintiffs allege that the NMFS has violated National Standard One, which requires that "[c]onservation and management measures shall prevent over-fishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States Fishing Industry." 16 U.S.C. § 1851(a)(1) (2000). Plaintiffs argue that the NMFS violated this Standard in two ways. First, by allowing recreational fishermen to land summer flounder without the consequence of an overage reduction or a pre-season closure, NMFS has reduced the optimum yield for the commercial and recreational sectors in violation of National Standard One. Second, the new biomass target proposed by the NMFS has reduced the commercial and recreational quotas to levels below the overfishing threshold established by the summer flounder FMP.

Finally, in Count seven plaintiffs allege that the NMFS's final rule of March 23, 2001 fails to comply with the requirements of National Standard Two, which requires that the "[c]onservation and management measures shall be based upon the best scientific evidence available." 16 U.S.C. § 1851(a)(2) (2000). Plaintiffs give two reasons why the rule violates National Standard Two. First, plaintiffs allege that NMFS does not rely on the best scientific evidence, and second, that NMFS has failed to adequately explain its decision to rely on the scientific evidence upon which it purports to rely.

In its response, the defendant argues that Counts two through six should be dismissed as time-barred under the MSA, which limits judicial review to claims brought within 30 days "after the date on which the regulations are promulgated." 16 U.S.C. § 1855(f)(1) (2000). In the alternative, defendant argues that the challenged rule is both fair and equitable, and it fully conforms with the standards of the MSA. As for Count one, the defendant states that this matter has been ruled on in plaintiffs' motion to enforce this Court's previous orders concerning the timing of annual summer flounder quotas, and is therefore moot. With respect to Count seven, the defendant states that based on the agency's national standard guidelines, the Secretary based his decisions upon information available at the time of the preparation of the FMP and implementing regulations. 50 C.F.R. § 305.315(b)(2) (2000). In addition, defendant contends that plaintiffs are confused as to the use of the terms "overfished," "overfishing," and "rebuilt" and have offered no evidence that there has been a violation of National Standard Two.

Finally, the defendant argues that the relief sought by the plaintiffs is beyond judicial discretion. Specifically, plaintiffs' request for an order requiring the NMFS to alter the way that it manages the commercial and recreational fisheries is directly contrary to the long-standing regulations implementing Amendment 2 to the FMP for summer flounder. 50 C.F.R. § 648.100 (2000). Additionally, the requested injunctive relief is legally unavailable under well-settled principles of administrative law. Defendant argues that if the Court determines that the administrative record does not support the challenged agency actions, then the only proper course is to remand the matter to the Secretary for additional investigation or explanation.

## II. Analysis

### A. Standard of Review

■ This matter is before the Court on cross-motions for summary judgment. The standard by which courts review agency action such as this is prescribed by the Administrative Procedure Act (APA) and incorporated into the M.S.A. § at 16 U.S.C. § 1855(f) which states that

> [t]he reviewing court shall...(2) hold unlawful and set aside agency action, findings, and conclusions found to be...(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law;....

5 U.S.C. §§ 706(2)(A)-(D) (2000); *Fishermen's Dock Cooperative, Inc. v. Brown*, 75 F.3d 164, 168 (4th Cir.1996). The courts in the Fourth Circuit generally review agency action seeking to determine "whether on the administrative record the agency action was arbitrary and capricious or otherwise illegal under the statutory standards quoted above." *Fishermen's Dock*, 75 F.3d at 168. A reviewing court will find a regulation arbitrary and capricious " 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Hall v. Evans*, 165 F.Supp.2d 114, 127–28 (D.R.I., 2001), *citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A reviewing court will find that a regulation is not in accordance with the law where the agency's interpretation of the regulation is unreasonable or inconsistent with statutory authority. *United States Nuclear Regulatory Comm'n v. Federal Labor Relations Authority*, 25 F.3d 229, 231 (4th Cir.1994).

### B. Time–Barred Claims

■ Section 305(f) of the M.S.A. § states that the "[r]egulations promulgated by the Secretary...shall be subject to judicial review...if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register...." 16 U.S.C. § 1855(f) (2000); *see also Kramer v. Mosbacher*, 878 F.2d 134, 136–37 (4th Cir.1989). The regulations at issue here stem from Amendment 2 to the summer flounder FMP and not from the January 29, 2001 emergency rule nor the March 23, 2001 final rule, as these rules did not alter the coast-wide, recreational fishery management measures that plaintiffs complain are unfair. Amendment 2 was promulgated on August 6, 1992, and thus, a challenge to regulations

arising from it are barred by the 30–day statute of limitations.

The plaintiffs argue that the action they are challenging is the summer flounder FMP as it violates the Sustainable Fisheries Act's ("SFA") amendments to the M.S.A. § and such a violation is not barred by the 30–day time limit for judicial review. The SFA was enacted in 1996 in order to stave off a crisis of fisheries failure in domestic commercial fishing stocks and to preserve commercial fishing families. *See* 142 Cong. Rec. S10794 (Sept. 18, 1996). The SFA did not become effective in the summer flounder regulatory scheme until October 26, 1999 when the NMFS published regulations to implement Amendment 12 to the Summer Flounder FMP. *See* 64 Fed.Reg. 57,587 (Oct. 26, 1999). The express purpose of Amendment 12 was "to meet the requirements of the [SFA]." *Id.* Therefore, to the extent that Amendment 12 perpetuated the status quo with respect to the same quota monitoring and overage measures which are now challenged by the plaintiffs, a lawsuit challenging the defendant's implementing regulations should have been filed no later than November 26, 1999. *See Connecticut v. Daley,* 53 F.Supp.2d 147, 161–62 (D.Conn.1999), *aff'd* 204 F.3d 413 (2d Cir. 2000) (holding that plaintiff's challenge to the summer flounder management measures dated back to the adoption of Amendment 2 to the summer flounder FMP in 1992). The regulations contested here (the January 29, 2001 emergency rule and the March 23, 2001 final rule), did not alter the Amendment 2 procedures with respect to monitoring and overage measures for commercial versus recreational fisheries. As in *Connecticut,* such a challenge is therefore time-barred because "there was no agency action concerning the quota system that is capable of being challenged...." *Connecticut,* 53 F.Supp.2d at 162.

Furthermore, the plaintiffs' argument that the regulations challenged here were the first to be promulgated since the Amendment 12 was enacted is incorrect. The defendant published final specifications for the commercial fishery each year from 1999–2001. *See* 63 Fed.Reg. 72,203 (Dec. 31, 1998); 65 Fed.Reg. 33,486 (May 24, 2000); 66 Fed.Reg. 16,151 (March 23, 2001). Thus, plaintiffs could have raised SFA-based challenges to either the 1999 or the 2000 specifications. By failing to do so, the statute of limitations has run. Therefore, the defendant's motion for summary judgment with respect to Counts two through five is granted.

The Court notes however, that plaintiffs' failure to raise timely, SFA-based challenges to past NMFS actions does not mean they are without redress. Plaintiffs have a number of administrative remedies which they may pursue. For example, if plaintiffs seek to modify the commercial or recreational quota setting process, they would be advised to file such a petition "for the issuance, amendment, or repeal of a rule," pursuant to the APA, 5 U.S.C. § 553(e). If plaintiffs do file a petition and that petition is denied, such a denial is reviewable by the court.

## C. Moot Claim

■ As stated above, plaintiffs argue that the NMFS has failed to provide them with a timely adjusted quota for the 2001 summer flounder fishing season, and thereby acted arbitrarily and capriciously and abused its discretion. However, as defendant argues, Judge Doumar of this Court has already ruled on plaintiffs' motion to enforce this Court's previous orders concerning the timing of annual summer flounder quotas. Defendant has published its quota for 2001 and thus, this count need not be addressed as it is moot.

## D. National Standard One

National Standard One requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States Fishing Industry." 16 U.S.C. § 1851(a)(1) (2000). Optimum yield is defined as

the amount of fish which, (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed on the basis of maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

16 U.S.C. § 1802(28) (2000). Plaintiffs' allege that NMFS has violated National Standard One for two reasons. First, by allowing recreational fishermen to land summer flounder without the consequence of an overage reduction or a pre-season closure, NMFS has reduced the optimum yield for the commercial and recreational sectors in violation of National Standard One. Second, the new biomass target proposed by the NMFS has reduced the commercial and recreational quotas to levels below the overfishing threshold established by the summer flounder FMP.

As an initial note, the argument that the defendant has violated National Standard One is identical to plaintiffs' argument in *North Carolina Fisheries Ass'n, Inc. v. Daley*, which was rejected. 16 F.Supp.2d 647 (E.D.Va.1997) (hereinafter *"NCFA I "*). As Judge Doumar stated in *NCFA I,*

Plaintiffs', however, misconstrue the term "optimum yield." The District of Columbia Circuit has defined optimum yield as "maximum yield *less* whatever

amount need be conserved for economic, social or ecological reasons." This Court has also held that "optimum yield is not the same as maximum yield." Furthermore, optimum yield is measured on a continuing basis, therefore "management measures must aim to achieve, on a continuing basis, the optimum yield from each fishery, not the optimum yield in a single year."

16 F.Supp.2d at 654–55 (internal citations omitted).

■ The optimum yield challenged here was established by the summer flounder FMP, not the January 29th emergency rule nor the March 23rd final rule. *See* 16 U.S.C. § 1853(a)(3) (2000) (specifying required provisions of an FMP). Contrary to plaintiffs' argument, as stated by Judge Doumar in *NCFA I*, the summer flounder optimum yield is not to be scrutinized on an annual basis, but rather a continuing basis. Additionally, even assuming that plaintiffs are correct in their belief that the new recreational measures of increased size of fish and decreased seasonal and bag limits will not prevent quota overages, such overages, the defendant argues, would not support a finding that the 2001 quota specifications preclude attainment of optimum yield. Optimum yield is not tied to a particular quota or the attainment thereof. Based on the way optimum yield is defined under Amendment 2 to the summer flounder FMP, overages in a particular segment of the fishery from year to year do not preclude attainment of optimum yield. However, even if the recreational overages did affect the optimum yield, challenges to the monitoring and overage measures are time-barred. *See* Part II–B, *supra.*

■ Plaintiffs also argue that because the new biomass target proposed by the NMFS reduces the fishing mortality rate for 2001 below the level set by the FMP,

the 2001 quota does not provide the optimum yield for either the recreational or commercial sectors. The biomass target for 2001 established a fishing mortality rate (F) of 0.23, which is lower than the rate established by the FMP, which sets F at 0.26. This biomass target provides 1,500 tons (or 3.28%) less fish than the fishing mortality rate would for 2001 if F=0.26 was utilized. While plaintiffs are correct with respect to their calculations, defendant's decision to adopt this temporary new biomass target for 2001 does not violate National Standard One.

The defendant justifies his decision for this new biomass target with two lines of reasoning. First, the biomass target, which was properly set under the MSA, was set to address years of overfishing in the summer flounder fishery. 16 U.S.C. § 1855(c) (2000). Since the industry had been fishing at a level above the Fmax target, setting a lower quota equivalent to a fishing rate lower than Fmax will get the fishery back on its rebuilding schedule to reach a level that will produce optimum yield. Second, this level was set in response to the District of Columbia Circuit's opinion, which required the NMFS to set the 2001 summer flounder quota, as well as all future summer flounder quotas, at a level that will achieve, with at least a 50% probability, the biomass level that would have been achieved at the end of 2001 if the F targets had been met in 1999 and 2000, and would be met in 2001. *See Natural Resources Defense Council v. Daley,* 209 F.3d 747, 756 (D.C.Cir.2000); *see also* 66 Fed.Reg. 16,151 (March 23, 2001). In adopting the interim biomass target of F=0.23, rather than F=0.26 stated in the summer flounder FMP, the NMFS believes it will have the beneficial impact of getting the stock to a level that produces optimum yield by allowing the biomass to grow more quickly as a result of less fishing. Also, this NMFS projects that this target will put the overall stock biomass in the same place as it would have been if the NMFS had met the applicable F standard in 1999 and 2000.

The determination of optimum yield and methods utilized to obtain optimum yield appear to be supported by evidence in the administrative record. As such, this Court cannot say that the defendant acted arbitrarily or capriciously, nor did he abuse his discretion in enacting the interim rule. Therefore, the Court finds that the defendant has not violated National Standard One.

### E. National Standard Two

In their final count, plaintiffs allege that the final rule of March 23, 2001 fails to comply with the requirements of National Standard Two for two reasons. First, plaintiffs allege that the NMFS does not rely on the best scientific evidence, and second, that the NMFS has failed to adequately explain its decision to rely on the scientific evidence upon which it purports to rely. Specifically, plaintiffs allege that the NMFS has acknowledged that even though the fisheries have exceeded the F=0.26 target since NMFS began to manage the fishery, the summer flounder stock has continued to increase in size. Yet despite this increase, the NMFS continues to state that the stock remains overfished. Plaintiffs argue that the NMFS's justification for this conclusion, that the stock will become density dependent due to a slowdown in growth rates, is not supported anywhere in the administrative record and therefore continued use of this F standard violates National Standard Two.

National Standard Two requires that the "[c]onservation and management measures shall be based upon the best scientific evidence available." 16 U.S.C. § 1851(a)(2) (2000). "Scientific information includes, but is not limited to, information of a biological, ecological, economic, or

social nature." 50 C.F.R. § 600.315(b)(1) (2000). Under the agency's national standard guidelines, the Secretary must base his determinations upon information available at the time of the preparation of the FMP or implementing regulations. 50 C.F.R. § 305.315(b)(2) (2000). "A reviewing court may decide only whether [the Secretary's] discretion was exercised rationally and consistently with the standards set by Congress . . . and may not substitute its own judgment . . ." *Maine v. Kreps,* 563 F.2d 1052, 1055 (1st Cir.1977). Rather, the reviewing court must "consider whether the decision [of the Secretary] was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In other words, "[f]or a court to set aside the Secretary's action, it 'must find that the administrative record is so devoid of justification for the Secretary's decision that the decision is necessarily arbitrary and capricious." ' *Connecticut,* 53 F.Supp.2d at 158, *quoting J.H. Miles and Co., Inc. v. Brown,* 910 F.Supp. 1138, 1146 (E.D.Va.1995).

In this case, the NMFS used the Biomass Maximum Sustainable Yield (Bmsy) as a proxy to indicate the threshold below which the stock is deemed to be overfished. "[T]he use of a proxy for MSY is scientifically acceptable and specifically allowed under the guidelines." *A.M.L. International, Inc. v. Daley,* 107 F.Supp.2d 90, 101 (D.Mass.2000), *citing* 50 C.F.R. §§ 600.310(c)(3), (d)(3)(i) ("when data are insufficient to estimate MSY, councils should base status determination criteria on reasonable proxies thereof to the extent possible"). Here, the NMFS has determined that the stock remains overfished because the January 1, 2000 estimate of biomass is 46,400 metric tons, which is below ½ Bmsy or 53,000 metric tons. However, even if the NMFS's estimate were over this threshold level, and hence, the fishery is not overfished, the stock has not been rebuilt to a level that provides for a maximum sustainable yield. Once the stock is rebuilt,[4] defendant concedes that it may need to adjust the quotas, however, that is premature at this point because the stock is still well below that level. The NMFS enacted the current F rate in order to allow the stock to continue rebuilding. This decision was discussed at length at the Mid–Atlantic Council Meeting Day Session, as well as in the 31st Northeast Regional Stock Assessment Workshop Summer Flounder Advisory Report, and the 31st Northeast Regional Stock Assessment Workshop Stock Assessment Review Committee Consensus Summary of Assessments. *See* Def. Reply at 14 (citing various parts of the Administrative Record).

In an attempt to prove the defendant's error, the plaintiffs rely on a hypothesis of Dr. Eric N. Powell, who states that the summer flounder stock has completely recovered. Plaintiffs argue that the defendant did not consider Dr. Powell's theory, as the administrative record is devoid of any information refuting it or explaining why the NMFS rejected it. Instead, plaintiffs allege, the NMFS has continued to rely on historical data and its own scientific conclusions from other restored stocks to make its conclusory prediction. *See* Pls. Reply at 19. However, this argument must also fail. As the defendant has pointed out, Dr. Powell himself stated that his theory has not been scientifically vet-

---

**4.** The summer flounder fishery will be rebuilt when biomass reaches 106,444 metric tons. *See* Def. Mot. for Summ. J. at p. 23, *citing* the 31st Northeast Regional Stock Assessment Workshop Stock Assessment Review Committee Consensus Summary of Assessments at p. 305.

ted, and that he recommended putting together a panel of experts to analyze his data. *See* Def. Reply at 16–18. While such a panel was not convened prior to the adoption of the 2001 quotas, the lack of such information does not invalidate the Secretary's decision to proceed based on existing scientific data. "The fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." 50 C.F.R. § 305.315(b) (2000). The defendant also provided an affidavit from Mark Terceiro [5], who recounts how a scientific peer review body has recently considered and discredited the alternative approach urged by the plaintiffs. *See* Def. Reply, Ex. 4.

Based on the evidence presented by the parties, this Court cannot say that the Secretary's decisions with respect to the fish mortality rate and biomass targets were unreasonable or devoid of justification. Therefore, the plaintiffs' argument that the defendant has violated National Standard Two is incorrect, and summary judgment is granted for the defendant.

**F. Relief Sought**

Since the defendant's motion for summary judgment is granted, and plaintiffs are denied their requested relief, there is no need for this Court to comment on whether such relief is beyond judicial discretion.

**III. Conclusion**

For the reasons stated above, the defendant's motion for summary judgment is GRANTED on all claims and the plaintiffs' motion for summary judgment is accordingly DENIED.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel for the parties.

It is so **ORDERED.**

---

**5.** Mr. Terceiro is the Leader of the Southern Demersal Fisheries Assessment Task of the Populations Dynamics Branch, Northeast Fisheries Science Center, National Marine Fisheries Service, Woods Hole, Massachusetts. Mr. Terceiro participated in the MAFMC's Scientific and Statistical Committe this past summer where various issues surrounding MSY, F, and Biomass levels of summer flounder were discussed and examined.