# United States Court of Appeals
## For the First Circuit

No. 16-2103

DAVID GOETHEL, XIII NORTHEAST FISHERY SECTOR, INC.,

Plaintiffs, Appellants,

v.

U.S. DEPARTMENT OF COMMERCE; WILBUR ROSS, in his official
capacity as Secretary, U.S. Department of Commerce; BENJAMIN
FRIEDMAN, in his official capacity as Acting Administrator,
National Oceanic and Atmospheric Administration; NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION; SAMUEL D. RAUCH III, in
his official capacity as Assistant Administrator for Fisheries
(Acting) for the National Marine Fisheries Service; NATIONAL
MARINE FISHERIES SERVICE,[*]

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph Laplante, Chief U.S. District Judge]

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), the following
substitutions have been made among the appellees: Wilbur Ross,
U.S. Secretary of Commerce, for former Secretary Penny Pritzker;
Benjamin Friedman, Acting Administrator, National Oceanic and
Atmospheric Administration, for former Administrator Kathryn
Sullivan; and Samuel D. Rauch III, Assistant Administrator for
Fisheries (Acting) for the National Marine Fisheries Service, for
former Assistant Administrator Eileen Sobeck.

Before

Kayatta, Circuit Judge,
Souter, Associate Justice,[**]
and Stahl, Circuit Judge.

---

Julie A. Smith, with whom Eric R. Bolinder, Ryan P. Mulvey, Cause of Action Institute, and James C. Wheat, Pierre A. Chabot, and Wadleigh, Starr & Peters, P.L.L.C., were on brief for appellants.

Thekla Hansen-Young, with whom John C. Cruden, Assistant Attorney General, Andrew C. Mergen, Robert Lundman, Alison C. Finnegan, Andrea Gelatt, Environment & Natural Resources Division, U.S. Department of Justice, and Mitch MacDonald, Gene Martin, National Oceanic and Atmospheric Administration, Office of General Counsel, Northeast Section, were on brief for appellees.

---

April 14, 2017

---

[**] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**STAHL**, **Circuit Judge**.  This case arrives on the court's deck from regulations promulgated by the National Marine Fisheries Service (NMFS), which require that on certain commercial fishing trips, fishermen must be accompanied on their vessels by at-sea monitors to ensure compliance with catch quotas, and that the industry must foot the bill for these unwelcome guests.  David Goethel, a New Hampshire fisherman joined in these proceedings by a group of commercial fishermen subject to this "industry funding" requirement, brought suit in federal district court in New Hampshire, claiming that the industry funding requirement violates several pertinent statutes and is also unconstitutional.

The district court granted summary judgment in favor of the government, reasoning that Goethel's suit was not filed within the applicable statute of limitations and that Goethel's statutory and constitutional challenges would have failed even if timely. On appeal, Goethel renews the bulk of his constitutional and statutory arguments, and urges this court to find that his suit was not time-barred.  Because we agree with the district court that Goethel's suit was not timely, we AFFIRM the grant of summary judgment in favor of the government, and do not reach the question of whether the industry funding requirement contravenes the edicts of the relevant statutes or the Constitution.

## I. Facts & Background

### A. The Regulations

The Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801-1884, was passed by Congress in 1976 in "[r]espon[se] to depletion of the nation's fish stocks due to overfishing." Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997). The stated goals of the MSA were, inter alia, to "conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1),(3). The MSA tasked the Department of Commerce[1] with regulating commercial fishing throughout the Exclusive Economic Zone of the United States, which extends 200 nautical miles from the seaward boundary of each coastal state. Id. § 1802(11); see also Pres. Proc. No. 5030, Exclusive Economic Zone of the United States, 48 Fed. Reg. 10,605 (Mar. 10, 1983) (defining the geographic scope of the

---

[1] The Department of Commerce in turn delegated this role to the National Oceanic and Atmospheric Administration ("NOAA"), which regulates the fisheries through its sub-agency, the National Marine Fisheries Service ("NMFS"). For simplicity's sake, these entities (all of which are named as defendants-appellees along with their respective chiefs in their official capacities) are referred to throughout this opinion as the "government."

- 4 -

Exclusive Economic Zone of the United States and the sovereign rights exercised therein under international law).

Pursuant to the MSA, eight regional Fishery Management Councils (FMCs) were established and charged with preparing, and, if circumstances warranted, amending, regional Fishery Management Plans (FMPs), which set certain standards for the fishing industry within the given FMC's regional purview. The MSA was amended in 2007 to include a requirement that each FMP include "measures to ensure accountability" with respect to catch limits. See 16 U.S.C. § 1853(a)(15). In an effort to effectuate this requirement, the regional FMP at issue in this case, the Northeast Multispecies FMP, was amended by the New England Council (the relevant FMC) to include a requirement that commercial fishermen within the purview of the Northeast Multispecies FMP must, on occasion, be accompanied by at-sea monitors (ASMs) who would collect certain data related to the particular fishing trip and the vessel's catch. See generally Northeast (NE) Multispecies Fishery, Amendment 16, 75 Fed. Reg. 18,262 (Apr. 9, 2010). The amendment that added this monitoring requirement was known as "Amendment 16," and was published on April 9, 2010, following a period of public comment. Goethel was a council member at the time of the enactment of Amendment 16 and voted against the proposal.

The at-sea monitors are human employees of private, third-party contractors who accompany the fishermen on board their

vessels during certain fishing trips, observe their activities to ensure compliance with fishing limits, and file reports upon their return to port. While catch quotas had previously been imposed, and overall catch hauls recorded upon a fisherman's return to port, at-sea monitors were intended to verify the specific geographic areas in which a boat fished, and also to monitor fish discards at sea. See 75 Fed. Reg. at 18,342. While not every fishing journey is monitored, costs for the monitors when a particular fishing trip is selected for such monitoring are estimated at $700-$800 per trip. See Goethel v. Pritzker, No. 15-CV-497-JL, 2016 WL 4076831, at *1 (D.N.H. July 29, 2016). Application of the at-sea monitoring program depends on whether a particular fishmerman is a member of a "sector," an association of "vessels that have voluntarily signed a contract and agree[d] to certain fishing restrictions," most notably catch restrictions and management requirements compiled in a sector operations plan. See Lovgren v. Locke, 701 F.3d 5, 15-16 (1st Cir. 2012) (citing Northeast (NE) Multispecies Fishery, Amendment 13, 69 Fed. Reg. 22,906, 22,945 (Apr. 27, 2004)). The sector program is voluntary and those vessels that choose not to join a sector are still able to fish from the "common pool" allocation of fish under a separate program that tracks number of days spent at sea, rather than using catch limits, and that does not require at-sea monitoring. See generally 50 C.F.R. § 648.82 (discussing days-at-sea restrictions for

members of the common pool).  The relevant sectors in this case are comprised of those fishing for groundfish.[2]

As is the case with many government regulations, Amendment 16 requires compliance without offering to pay or reimburse the regulated entity for the cost of compliance.  To the contrary, Amendment 16 itself requires that the sector fishermen bear the costs of the at-sea monitors.  See Northeast (NE) Multispecies Fisheries, Amendment 16, 75 Fed. Reg. 18,262, 18,342 (April 9, 2010) ("Beginning in fishing year 2010, a sector must develop, implement, and pay for, to the extent not funded by NMFS, an independent third-party dockside/roving and at-sea/electronic monitoring program that is satisfactory to, and approved by, NMFS . . . .").  Notwithstanding this clear requirement, the government paid the ASM costs throughout the first several years of the program's existence.  See, e.g., Standardized Bycatch Reporting Methodology Omnibus Amendment, 80 Fed. Reg. 37,182, 37,185 (June 30, 2015) ("To date, we have been able to provide sufficient funding for the groundfish sector at-sea monitoring program such that industry did not have to pay for at-sea monitoring.").

However, a 2011 ruling by the D.C. Circuit required NMFS to fund a separate reporting program, see Oceana v. Locke, 670

---

[2] "Groundfish" is a generic term for various bottom-dwelling fish species including, most notably, cod, haddock, halibut, and flounder.  Goethel, 2016 WL 4076831, at *2 n.4.

F.3d 1238 (D.C. Cir. 2011), which in turn depleted the funds that the agency had available for the at-sea monitoring program in the Northeast. Beginning in 2015, responding to funding shortfalls caused by the requirements of the D.C. Circuit ruling, NMFS took a series of steps to inform the sectors that it could no longer fund the at-sea monitoring costs, and the sectors themselves and their constituent fishermen would soon be on the hook for these costs, as envisioned by Amendment 16. Because of the importance of the various dates in 2015 for purposes of the statute of limitations, we explain the relevant communications between the agency and the regulated sectors below.

- **March 9, 2015**: NMFS published a Proposed Rule to approve seventeen sector operations plans for fishing years 2015 and 2016. While noting that the agency had been able to pay the costs of ASM coverage during the years 2012 to 2014, the agency explained that this would change: "Due to funding changes . . . we expect that sector vessels will be responsible for paying at-sea costs associated with the ASM program before the end of the 2015 fishing year." Proposed Rule, 2015 and 2016 Sector Operations Plans for Northeast Multispecies Fishery, 80 Fed. Reg. 12,380, 12,385 (Mar. 9, 2015).

- **May 1, 2015**: NMFS published a final rule that reiterated the same language from the March 9th proposed rule, namely, that the agency "expect[ed] that sector vessels will be responsible for paying the at-sea portion of costs associated with the sector ASM program before the end of the 2015 fishing year." Final Rule, 2015 and 2016 Sector Operations Plans for Northeast Multispecies Fishery, 80 Fed. Reg. 25,143, 25,148 (May 1, 2015). The notice also added that "funding for our portion of ASM costs is expected to expire before the end of the 2015 fishing year" but "we have begun working on an implementation plan to

- 8 -

help ensure a seamless transition when the industry assumes responsibility for at-sea costs in 2015." Id. at 25,149.

- **November 10, 2015**: NOAA Northeast Fisheries Science Center announced that "federal funds in the major at-sea monitoring contracts for northeast groundfish sectors will be expended by December 31, 2015," and that "[t]ransition of monitor sea-day costs to industry will therefore be effective January 1, 2016." This announcement was sent to the relevant sectors in an email, but was not published in the Federal Register. The email, titled "Update: Federal Funding for At-Sea Monitoring Ends December 31, 2015," stated, in pertinent part:

> Based on the data we have on actual fishing effort, we have determined that federal funds in the major at-sea monitoring contracts for northeast groundfish sectors will be expended by December 31, 2015. Transition of monitor sea-day costs to industry will therefore be effective January 1, 2016.

Although the November 10th email notification purported to establish a date certain when industry funding would kick in (January 1, 2016), the government was ultimately able to continue paying ASM costs through mid-February 2016. Additionally, on June 23, 2016, a NOAA email notification informed the Northeast Sector that the agency would fully fund the shore-based monitoring program and would "use remaining funds to offset some of industry's costs of the groundfish at-sea monitoring program."

B. The Parties

Plaintiff-appellant David Goethel is a New Hampshire-based commercial fishermen and sector member who is subject to the

various provisions of the Northeast Multispecies FMP, including the industry funding requirement for the at-sea monitoring program. Plaintiff-appellant XIII Northeast Fishery Sector, Inc. ("Sector 13"), one of the approved groundfish sectors, is a corporation organized under Section 501(c)(5) of the U.S. Internal Revenue Code, and consists of thirty-two fishermen and twenty active boats. The members of Sector 13 are also subject to the Northeast Multispecies FMP, including the at-sea monitoring program. Goethel and Sector 13 presented evidence that the industry funding requirement for the at-sea monitoring program would impose draconian costs on the Sector and its members, including citing a NOAA report which concluded that "nearly 60% of the fleet could see negative returns to owner when full 2015 ASM costs are factored in." Plaintiffs-appellants are concerned that the industry funding requirement will essentially render the groundfish industry no longer viable from a commercial standpoint.

The defendants-appellees are the U.S. Department of Commerce, the NOAA, and the NMFS, as well as their respective directors in their official capacities.

C. The Lawsuit

Goethel filed his suit on December 9, 2015. As discussed in greater detail below, Goethel argues that because his complaint was filed within thirty days of the November 10th email notification, it was therefore timely under the MSA's thirty-day

- 10 -

statute of limitations. In his complaint and subsequent briefing to the district court, Goethel advanced a multitude of alleged statutory and constitutional violations, falling into one of three categories: an allegation that the industry funding requirement is unlawful, a challenge to the at-sea monitoring requirement in general, and a facial attack on the entire Magnuson-Stevens framework. We briefly describe these claims below.

First, Goethel alleged that the industry funding requirement was unlawful because the agency acted in excess of its statutory authority under the MSA and failed to follow proper procedures, resulting in agency action that was arbitrary, capricious, and an abuse of discretion, in violation of the requirements of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).[3] In addition to alleging a violation of the APA, Goethel cast his net even further, alleging that the industry funding requirement was an improper tax in violation of the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, the Anti-Deficiency Act (ADA)[4], 31 U.S.C. § 1341, and the Miscellaneous

---

[3] With some exceptions not relevant to the present case, the MSA generally incorporates the APA's judicial review provisions. See 16 U.S.C. § 1855(f)(1)(B).

[4] In relevant part, the ADA prohibits federal officers from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation" and from "involv[ing] [the United States] in a contract or obligation for the payment of money before an

- 11 -

Receipts Act (MRS)[5], 31 U.S.C. § 3302, and also constituted the imposition of improper user fees in violation of the Independent Offices Appropriations Act (IOAA)[6], 31 U.S.C. § 9701. He also alleged that the industry funding requirement violated the interstate commerce clause, U.S. Const. art. I, § 8, cl. 3, by requiring that the fishermen enter the market for at-sea monitors and purchase those services. Finally, he alleged two procedural violations: that the agency failed to prepare a Regulatory Flexibility Analysis, as required by the Regulatory Flexibility Act (RFA), 5 U.S.C. §§ 601-612, and that it failed to assess the impact of its regulatory actions on the environment, as required by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370e. All of these arguments are preserved on appeal, with the exception of the alleged NEPA violation, which is not raised in Goethel's opening brief.

Second, Goethel challenged the at-sea monitoring program itself (as distinct from the requirement that the sectors pay for

---

appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(A)-(B).

[5] This statute provides that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b).

[6] The IOAA permits an agency to "prescribe regulations establishing the charge for a service or thing of value provided by the agency," 31 U.S.C. § 9701(b), in effect recouping fees from those who receive services provided by the agency.

it) on constitutional grounds. The sheer volume of constitutional claims that Goethel made initially suggests that he was, in a manner of speaking, on a fishing expedition. Specifically, he alleged that the at-sea monitoring requirement violates the First Amendment by "compelling fishermen to join sectors"[7]; violates the Port Preference Clause[8] by discriminating between the various States, leading fishing vessels to prefer one state's port over another; and violates the Fourth Amendment's prohibition on unreasonable searches and seizures. Not content to leave any part of the kitchen sink unused, Goethel also alleged that the at-sea monitoring program violates the Third Amendment's prohibition on the quartering of soldiers during peacetime because fishermen were compelled to accommodate federally-mandated monitors on multi-day fishing voyages.[9] Of these arguments, only the Fourth Amendment claim is preserved in this appeal.

---

[7] This argument was abandoned by the plaintiffs during an early phase of the proceedings below, was not addressed by the district court in its opinion, and is not raised on appeal.

[8] See U.S. Const. art. I, § 9, cl. 6 ("No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another."). Goethel likewise abandoned this argument prior to summary judgment, and does not raise it on appeal.

[9] See U.S. Const. Amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."). The Third Amendment was a response to the Quartering Acts of 1765 and 1774, in which Parliament authorized British military commanders to requisition private homes as barracks, see Engblom

Third, Goethel alleged that the entire MSA regulatory framework was unconstitutional.  First, he alleged that the regional FMCs are improperly constituted, in violation of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2, because members of the councils are "inferior officers" whose appointments could thus only be vested "in the President alone, in the Courts of Law, or in the Heads of Departments."  Goethel argues that because the governors of the various coastal states are involved in nominating individuals to the councils, and because state executive officials are not among the permissible entities in which Congress can vest the appointment power for inferior officers, the councils are constitutionally infirm and actions taken by those councils, including the Northeast Multispecies FMP, are void. Second, Goethel argues that the MSA conscripts state officers by requiring that they participate in the councils, in turn violating the Tenth Amendment anti-commandeering doctrine.  See Printz v. United States, 521 U.S. 898, 935 (1997) ("The Federal Government

v. Carey, 677 F.2d 957, 967 (2d Cir. 1982) (Kaufman, J., concurring in part and dissenting in part), and its application to private contractors engaged in on-board monitoring of the fishing industry is a dubious proposition to say the least.  However, as with the Port Preference Clause and First Amendment claims, the plaintiffs conceded their Third Amendment argument before summary judgment, thus depriving this court of the rare opportunity to opine on the scope and application of the Third Amendment.  See Goethel, 2016 WL 4076831, at *9 n.13 ("Earlier in this litigation, plaintiffs also argued that industry funding of ASM also violated the Third Amendment's prohibition against quartering of soldiers. They no longer advance that claim.").

may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). The alleged violations of the Appointments Clause and the Tenth Amendment are preserved in this appeal.

### D. The District Court Ruling

After the parties cross-moved for summary judgment, the district court, in an order dated July 29, 2016, rejected Goethel's various challenges and granted summary judgment in favor of the government. First, the court found that the claims were not timely because "the plaintiffs [sic] 30-day window to challenge the industry funding component of ASM closed, at the latest, in June 2015, well before this suit was filed." Goethel, 2016 WL 4076831, at *4. The district court rejected Goethel's argument that the November 10th email notification was a separately reviewable "action" under the MSA, but also declined the government's invitation to find that the statute of limitations began to run in 2012 when the regulations implementing Amendment 16 took effect, which would have meant Goethel's claims were time-barred by a matter of years. See id. at *3-4.

Second, the court, after concluding that Goethel's suit was time-barred, proceeded to analyze Goethel's statutory and constitutional claims, and found that they would have failed on

the merits even if his suit had been filed within the MSA's thirty-day statute of limitations.

This timely appeal followed.

## II. Analysis

The district court determined that Goethel's complaint was barred by the MSA's statute of limitations, a finding that we review de novo. See Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 113 (1st Cir. 2009). The MSA includes provisions that govern judicial review. Specifically, parties may challenge "regulations promulgated by" NMFS, 16 U.S.C. § 1855(f)(1), and they may also seek review of "actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing," id. § 1855(f)(2). Furthermore, as relevant (and ultimately dispositive) to this case, judicial review is only available if a complaint "is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." Id. § 1855(f)(1).

As an initial matter, we address an argument that Goethel spends much time advancing in both his opening and reply briefs: that he is entitled to pre-enforcement review under the APA, in lieu of violating the statute and then bringing his statutory and constitutional arguments as a defense to an enforcement action.

- 16 -

The thirty-day statute of limitations embodied in the MSA, Goethel argues, does not apply to pre-enforcement review. Not so. Of course pre-enforcement review is available as a general matter under the MSA, but, as the district court noted below, "plaintiffs cite no authority which permits the court to waive the statute of limitations applicable to pre-enforcement review" of agency action under the MSA. Goethel, 2016 WL 4076831, at *4 n.4.

On appeal, Goethel renews this same argument, but fails to cite any authority for the proposition that the thirty-day statute of limitations in the MSA can be deep-sixed simply by the fact that the party seeking judicial review is making a pre-enforcement challenge to the statute in question. Indeed, the courts that have encountered this question appear to have uniformly concluded that the thirty-day statute of limitations cannot be sidestepped when a party is challenging a regulation promulgated pursuant to NMFS authority under the MSA. See, e.g., Turtle Island Restoration Network v. U.S. Dep't of Commerce, 438 F.3d 937, 939 (9th Cir. 2006) (concluding that although the appellant's claims were "framed . . . in terms of violations of the APA [and environmental statutes]," they were "in actuality . . . challenge[s] to the reopening of the [swordfish] Fishery" and thus subject to the MSA's thirty-day statute of limitations); N.C. Fisheries Ass'n, Inc. v. Evans, 172 F. Supp. 2d 792, 798-99 (E.D. Va. 2001) (holding that challenges to regulations arising from an

- 17 -

FMP amendment must be filed within the thirty-day statute of limitations period from the promulgation of the amendment itself); F/V Robert Michael, Inc. v. Kantor, 961 F. Supp. 11, 15 (D. Me. 1997) (concluding that lobstermens' challenge to the Department of Commerce's denial of permits, on the grounds that such a denial violated the MSA, was time-barred because "[p]laintiffs' quarrel lies with the regulation itself" and that regulation had been promulgated long before the plaintiffs sought review); Stinson Canning Co. v. Mosbacher, 731 F. Supp. 32, 34–35 (D. Me. 1990) ("Plainly, Congress intended pre-enforcement review since it provided that a petition for such review must be filed thirty days from promulgation."). We agree with these cases and hold that Goethel's pre-enforcement challenge only can proceed if it was filed within thirty days of the "action" in question as required by § 1855(f)(1).

Goethel's case, therefore, hinges on whether the November 10th email is a separately reviewable "action" for purposes of the thirty-day statute of limitations, since any of the other pertinent dates -- the 2010 promulgation of Amendment 16 which included by its own terms a requirement of industry funding, and the March 9th and May 1st, 2015, proposed and final rules announcing the expected exhaustion of government contributions to the at-sea monitoring program -- would fall well outside the thirty-day window. Goethel argues that it was on November 10th,

for the first time, that the government established a "date certain" when industry funding would finally take effect, and therefore this date should be treated as the relevant "action."

In support of this argument, he cites to Bennett v. Spear, 520 U.S. 154 (1997), where the Supreme Court explained that agency actions are reviewable under Section 704 of the APA when they (1) "mark the 'consummation' of the agency's decision-making process" and (2) are events "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Id. at 177-78. Here, Goethel argues, the November 10th date was both the "consummation of the agency's decision-making process" by setting a date on which money would no longer be expended by the agency, and also when "obligations" had been "determined," namely who would pay the monitoring costs. Goethel also argued to the district court, and argues again on appeal, that prior to having a date certain on which industry funding actually would kick in, a potential suit would have been dismissed as unripe. See Goethel, 2016 WL 4076831, at *4 n.6 (rejecting Goethel's ripeness argument as "necessarily speculative," but also observing that it was "inconceivable that a suit filed within 30 days of the Rule's publication in May 2016 [sic] would have been found unripe").

We are not convinced by Goethel's argument. First, the language of § 1855(f) itself requires that for judicial review to be available, a complaint must be "filed within 30 days after the

date on which the regulations are <u>promulgated</u> or the action is <u>published in the Federal Register</u>, as applicable."  16 U.S.C. § 1855(f)(1) (emphasis added).  Goethel does not argue that the November 10th email is a stand-alone "regulation," which, although not defined in the MSA, generally "refers to legally binding obligations placed upon a council and/or the agency which have the force and effect of law and, as such, are analogous to substantive rules issued by an administrative agency which are subject to APA review."  <u>Tutein</u> v. <u>Daley</u>, 43 F. Supp. 2d 113, 121 (D. Mass. 1999) (citing <u>Chrysler Corp.</u> v. <u>Brown</u>, 441 U.S. 281, 301-302 (1979)).  Nor was the November 10th email published in the Federal Register.

Second, to the extent that the language of the statute allowing for review within thirty days of the time when "the action is published in the Federal Register, as applicable," envisions a category of "actions" for which publication is <u>not applicable</u>,[10]

---

[10] In briefing and at oral argument, Goethel emphasized that insulating all non-published agency actions from review might create incentives for agencies to announce changes in particular regulatory programs that do shift certain legal obligations for regulated parties, and avoid legal challenges by refraining from publishing such decisions.  While documents "having general applicability and legal effect" are generally "required to be filed for public inspection with the Office of the Federal Register and published in the Federal Register," 1 C.F.R. § 5.2(c), we do share Goethel's concern that a bright-line rule requiring publication in order for judicial review to be available under the MSA might preclude judicial review in cases where an unpublished action taken by an agency does, in fact, lead to a change in the legal position of regulated parties.  Because we find that NOAA's November 10th email had no such effect, we save for a later day whether, under

we disagree that the November 10th email would qualify.  Agency "action" for purposes of administrative law generally "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).  Goethel's argument, that the email notification was the equivalent of an agency "order," clearly fails, as the APA defines an order as resulting from agency adjudication, see id. § 551(7), and there is no suggestion that the November 10th email was the product of an agency adjudication. Rather, the email was one of several updates sent to regulated parties throughout 2015, a routine effort to keep the sectors abreast of developments pursuant to a final rule which had been published in May of 2015.[11]  In short, the November 10th notification does not have the significance that Goethel seeks to

certain circumstances, unpublished agency actions could still be subject to judicial review under the MSA.

[11] While we need not reach this issue given that the November 10th email does not meet the basic requirements for reviewable agency "action," we think, as a factual matter, that the sectors' obligation to pay was certainly consummated, at the latest, with publication of the May 2015 final rule.  Therefore, Bennett v. Spear, which observed that for agency action to be "final," it must "mark the 'consummation' of the agency's decision-making process," 520 U.S. at 178 (internal citation omitted), is of no help to Goethel in this case because the November 10th email had no such effect.

assign to it, and we conclude that it is not a separately reviewable agency "action" for purposes of § 1855(f)(1).[12]

We agree with the district court that the most recent "action" that could have plausibly been challenged was the May 2015 final rule, and for that reason we agree with the district court that the "plaintiffs [sic] 30-day window to challenge the industry funding component of ASM closed, at the latest, in June 2015, well before this suit was filed." Goethel, 2016 WL 4076831, at *4. Therefore, the suit is time-barred.

### III. Conclusion

Because we find that Goethel's suit was not filed within the MSA's thirty-day statute of limitations, we need go no further, and we take no position on the district court's statutory and constitutional rulings. However, given NOAA's own study which indicated that the groundfish sector could face serious difficulties as a result of the industry funding requirement, we note that this may be a situation where further clarification from Congress would be helpful for the regulated fisheries and the

---

[12] Goethel and Sector 13 were subject to the applicable regulations at the time NMFS promulgated Amendment 16, and at the time that the government announced, in the May 2015 final rule, that the industry funding requirement would kick in at the beginning of the 2016 calendar year. Therefore, we need not consider what other rights, if any, a party who became subject to the regulations for the first time more than thirty days after the May 2015 final rule would have, nor do we take any position on how the MSA's thirty-day statute of limitations would apply to a claim by such a party.

agency itself as it balances the competing goals of conservation and the economic vitality of the fishery.

While the concurring opinion suggests that this is inappropriate, we note that it is not uncommon in this and other circuits to include language in opinions that flags potential issues for Congress to consider, should it choose to do so.[13] See, e.g., Sony BMG Music Entm't v. Tenenbaum, 660 F.3d 487, 490 (1st Cir. 2011) (commenting, in the context of a copyright infringement suit, that the case "raises concerns about application of the Copyright Act which Congress may wish to examine"); Slayton v. Am. Express Co., 604 F.3d 758, 772 (2d Cir. 2010) (noting, while not deciding the issue, that "Congress may wish to give further direction on how to resolve [a] tension" in the Private Securities Litigation Reform Act); Holender v. Mut. Indus. N. Inc., 527 F.3d 352, 357 (3d Cir. 2008) (observing, in a dispute over the scope of the Age Discrimination in Employment Act, that "Congress may wish to revisit this regulatory regime if it proves unworkable"); Elsenety v. Health Care Fin. Admin., 85 F. App'x 405, 410 (6th Cir. 2003) (acknowledging that the statutory framework in question

---

[13] Indeed, beginning in 1995 with the Long Range Plan for the Federal Courts, the Judicial Conference and Congress have collaborated on the Project to Provide Congress with Appellate Opinions Bearing on Technical Matters of Statutory Construction, and we have occasionally sent opinions to Congress that we believe may warrant additional clarification via legislation, precisely because, as the concurring opinion suggests, the judiciary lacks expertise on the policy trade-offs faced by Congress.

created a "harsh rule" and that "[a]t some point in the future, Congress may wish to reexamine" the statute); Cefalu v. Vill. of Elk Grove, 211 F.3d 416, 428 (7th Cir. 2000) (suggesting that certain in-trial evidence presentations are likely reimbursable under statute governing fees for exemplification, but noting that "[g]iven the costs associated with some of these" practices, "this is an area that Congress may wish to revisit and supply further guidance"); see also United States v. Godin, 534 F.3d 51, 65 (1st Cir. 2008) (Lynch, J., concurring) (noting that "Congress may wish to clarify in new legislation the scope of the enhanced penalties" under an aggravated identity theft statute); Schafer v. Am. Cyanamid Co., 20 F.3d 1, 7 (1st Cir. 1994) (Stahl, J., concurring) (agreeing with the majority's interpretation of the National Childhood Vaccine Injury Act, but "respectfully suggest[ing] that this is an issue which Congress may wish to revisit."); Olson v. Gen. Dynamics Corp., 960 F.2d 1418, 1425 (9th Cir. 1991) (Reinhardt, J., concurring) ("The proliferation of ERISA [Employee Retirement Income Security Act] preemption cases, in my view, raises a question as to whether ERISA is having an effect that is substantially contrary to that intended by those who favored its adoption. This is a matter which Congress may wish to examine carefully."); United States v. Collins, CR No. 03-51 S, 2016 WL 6477031, at *3 n.1 (D.R.I. Nov. 2, 2016) (suggesting that "Congress may wish to consider amending the enumerated offenses clause of

[the Armed Career Criminal Act] to include those crimes, such as murder, which previously were understood to fall squarely within the residual clause.").

Because Goethel's claim is untimely, however, we **AFFIRM** the grant of summary judgment in favor of the government.

**-Concurring Opinion Follows-**

**KAYATTA**, **Circuit Judge, concurring**.  I join in the panel's opinion with the exception of its call on Congress to provide further clarification.  The nicely reasoned conclusion that the petition is untimely means that we lack jurisdiction to consider the merits of the appeal.  See Norbird Fisheries, Inc. v. Nat'l Marine Fisheries Serv., 112 F.3d 414, 416 (9th Cir. 1997). My colleagues nevertheless call on Congress to provide "further clarification" not concerning the matter of our jurisdiction, but rather concerning "the industry funding requirement" in light of the "competing goals" at stake.  To the extent my colleagues imply that the statute is unclear, or that the "competing goals" at stake trigger some sort of express statement preference in these circumstances, I respectfully disagree.  The default norm, manifest without express statement in literally hundreds of regulations, is that the government does not reimburse regulated entities for the cost of complying with properly enacted regulations, at least short of a taking.  If this statute needs clarification on this point, then so too do hundreds of others. Additionally, given that we have no jurisdiction to hear the merits of this appeal, nor any expertise on the policy trade-offs made by Congress in deciding how best to protect our fisheries from overfishing, and who should pay for that protection, I think it prudent to be more parsimonious with our advice.  See Stephen Breyer, Active Liberty:  Interpreting Our Democratic

<u>Constitution</u> 5 (2005) ("The judge, compared to the legislator, lacks relevant expertise.").