# United States Court of Appeals
## For the First Circuit

Nos. 25-1212
    25-1213

NEW ENGLAND FISHERMEN'S STEWARDSHIP ASSOCIATION,

Plaintiff, Appellant/Cross-Appellee,

JERRY LEEMAN,

Plaintiff,

v.

HOWARD LUTNICK, in the capacity of Secretary of Commerce;
NATIONAL MARINE FISHERIES SERVICE; EMILY MENASHES, in the
capacity of Acting Assistant Administrator for Fisheries at
NMFS; SAMUEL D. RAUCH, III, in the capacity of Deputy Assistant
Administrator for Regulatory Programs at NMFS,

Defendants, Appellees/Cross-Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

---

Before

Aframe, Lynch, and Dunlap,
Circuit Judges.

---

John M. Gore, with whom Donald F. McGahn, II, John Henry
Thompson, Louis J. Capozzi, III, Julia Kazam, and Jones Day were
on brief, for appellant New England Fishermen's Stewardship
Association.

Daniel Halainen, Attorney, U.S. Department of Justice, Environment and Natural Resources Division, with whom Adam R.F. Gustafson, Acting Assistant Attorney General, and Thekla Hansen-Young, Attorney, U.S. Department of Justice, Environment and Natural Resources Division, were on brief, for appellees Howard Lutnick, National Marine Fisheries Service, Emily Menashes, and Samuel D. Rauch, III.

J. Timothy Hobbs and K&L Gates LLP on brief for Seafood Harvesters of America, amicus curiae.

---

April 30, 2026

---

**LYNCH**, **Circuit Judge**.  This appeal stems from a dispute between the New England Fishermen's Stewardship Association ("Association"), the Secretary of Commerce ("Secretary"), and the National Marine Fisheries Service ("NMFS") over the Framework Adjustment 65 Final Rule and implementing regulations, which affected the Association's members by reducing catch limits for several species in the Northeast Multispecies Fishery Management Plan.  The Association here argues that the Framework Adjustment 65 Final Rule and implementing regulations must be invalidated under the Appointments Clause of the U.S. Constitution because of the involvement of the advisory New England Fishery Management Council.  We disagree and, on de novo review, hold the Association is not entitled to relief.

## I.

We summarize the Magnuson-Stevens Fishery Conservation and Management Act's ("Act"), 16 U.S.C. § 1801 et seq., fishery management scheme.  We then describe the undisputed factual background which is relevant to the Association's request for injunctive and declaratory relief as to Framework Adjustment 65.

### A. The Magnuson-Stevens Fishery Conservation and Management Act

The Act, the provisions of which govern this dispute, states thirteen Congressional findings at 16 U.S.C. § 1801(a) that explain its creation of a "national program for the conservation

and management of the fishery[1] resources of the United States," which Congress found "[wa]s necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." 16 U.S.C. § 1801(a)(6). Congress further found that while fisheries faced threats of "increased fishing pressure, . . . inadequacy of fishery resource conservation and management practices and controls, [and] . . . habitat losses," id. § 1801(a)(2), nonetheless fisheries are "finite but renewable" resources which "can be conserved and maintained so as to provide optimum yields on a continuing basis," "[i]f placed under sound management before overfishing has caused irreversible effects," id. § 1801(a)(5).

At § 1801(b), Congress next stated its seven purposes in passing the Act. One of these purposes explained the structure of the fishery management program. Congress sought to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of [fishery management] plans [("FMPs")]" and to "take into account the social and economic needs of the States." Id. § 1801(b)(5). To achieve

---

[1] Fisheries are defined in relevant part as "stocks of fish which can be treated as a unit for purposes of conservation and management." 16 U.S.C. § 1802(13)(A).

these purposes, the Act "establish[ed] Regional Fishery Management Councils" and gave them a structured role of "prepar[ing], monitoring, and revisi[ng] [FMPs]." Id.

An FMP sets out "the conservation and management measures . . . necessary and appropriate for the conservation and management of [a given] fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." Id. § 1853(a)(1)(A). Congress mandated that each FMP be "consistent with the [ten] national standards for fishery conservation and management." Id. § 1851(a). These national standards are "broadly worded" and "can be in tension with one another." Lovgren v. Locke, 701 F.3d 5, 32 (1st Cir. 2012). The national standards require, for example, that the "[c]onservation and management measures" in an FMP "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry," 16 U.S.C. § 1851(a)(1), while also requiring FMPs to "take into account the importance of fishery resources to fishing communities . . . [and] minimize adverse economic impacts on such communities," id. § 1851(a)(8).

This structure furthers the seven policy objectives of the Act set out in § 1801(c), including the objective:

> to assure that the national fishery
> conservation and management program utilizes,
> and is based upon, the best scientific

- 5 -

information available; involves, and is responsive to the needs of, interested and affected States and citizens; considers efficiency; draws upon Federal, State, and academic capabilities in carrying out research, administration, management, and enforcement; considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish; and is workable and effective[.]

Id. § 1801(c)(3).

The Act mandates that the Secretary, who is responsible for the Act's fishery management scheme, "establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans." Id. § 1851(b). The Secretary has delegated his authorities under the Act to the Under Secretary for Oceans and Atmosphere at the National Oceanic and Atmospheric Administration ("NOAA"), who has in turn delegated authority to NOAA's Assistant Administrator for Fisheries, the official that oversees NMFS ("NMFS Director"). NMFS administers the Act under this delegation. See Loper Bright Enters. v. Raimondo, 603 U.S. 369, 380 (2024) ("The [NMFS] administers the [Act] under a delegation from the Secretary of Commerce.").

There are eight Regional Fishery Management Councils ("Councils") under the Act, which advise the Secretary and his designee, NMFS, on fishery management in the geographical area "seaward" of each Council's constituent States and territories.

Id. § 1852(a)(1)(A)-(H), (h). The voting members of each Council fall into three categories, reflecting the interests of the affected States, the fisheries, and the federal government.[2] Id. § 1852(b)(1). First, the "principal State official with marine fishery management responsibility and expertise in each constituent State" or his "designee" is a voting member of the Council. Id. § 1852(b)(1)(A). This official serves on the Council "so long as the official continues to hold such [a] position," which ensures that each constituent State government always has a voting member on the Council. Id. Second, the NMFS "regional director" for the relevant geographic area, who is a career Senior Executive Service official, is a voting member on each Council. Id. § 1852(b)(1)(B). Third, the Secretary selects an Act-specified number of voting members from lists submitted by constituent State governors. Id. § 1852(b)(2)(C). Each governor's list must have at least three names, id., and the Secretary must select at least one individual from each State's list, id. § 1852(a)(1)(A)-(H). Individuals submitted on these lists must be "knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the

---

[2] The Act also sets out the nonvoting members of each Council, which include regional representatives from the U.S. Fish and Wildlife Service, the Coast Guard, and the Marine Fisheries Commission, as well as a representative from the Department of State. 16 U.S.C. § 1852(c)(1)(A)-(D).

fishery resources of the geographical area concerned." Id. § 1852(b)(2)(A). Before submitting the three or more names to the Secretary, the governor must also have "to the extent practicable, first consulted with representatives of the commercial and recreational fishing interests of the State regarding th[e] [submitted] individuals." Id. § 1852(b)(2)(C). If the Secretary determines that an individual does not meet these requirements, the governor may submit a revised list or provide additional explanation of an individual's qualifications. Id.

Only the Secretary is vested with lawmaking and enforcement power under the Act. The Secretary is authorized with the "general responsibility to carry out any [FMP] or amendment approved or prepared by him, in accordance with the provisions of [the Act]." Id. § 1855(d). The FMPs do not have the power to bind; only Secretary-promulgated regulations have any regulatory or legally binding effect. Only the Secretary, through his designee NMFS, is authorized to promulgate regulations to effectuate the FMPs. Id. § 1854(a)(1), (b)(1). The Act gives the Councils a structured role in advising the Secretary on both FMPs and regulations, and because the role of the Councils is different as to each, we describe them separately.

### 1. The Process of Approving Non-Binding FMPs

FMPs and amendments thereto may originate from either the Council or the Secretary. See id. § 1853(a). When any fishery

in a Council's geographic area "requires conservation and management," that Council "prepare[s] and submit[s] to the Secretary" a proposed FMP, as well as proposed "amendments . . . that are necessary." Id. § 1852(h)(1). Once the Secretary receives a Council's proposed FMP or proposed amendment to an FMP, the Secretary must review it "to determine whether it is consistent with the national standards, the other provisions of [the Act], and any other applicable law." Id. § 1854(a)(1)(A).

In conducting this review, the Act requires the Secretary to seek independent input from specified parties, including some parties which the Council does not have a statutory authority or obligation to consult. The Secretary, but not the Council, is required to "consult with the Secretary of State with respect to foreign fishing," id. § 1854(a)(2)(B); foreign fishing is defined as "fishing by a vessel other than a vessel of the United States," id. § 1802(19). Beyond that, the Secretary, but not the Council, is required to consult with the different Secretary overseeing the Coast Guard about "enforcement at sea." Id. § 1854(a)(2)(C). The Secretary must also "publish in the Federal Register a notice stating that the [Council-proposed] plan or amendment is available" to solicit comments from the general public, id. § 1854(a)(1)(B), and must "take into account the information, views, and comments received from interested persons"

when conducting his review of a Council-proposed plan or amendment. Id. § 1854(a)(2)(A).

"[W]ithin 30 days of the end of the comment period," the Secretary must "approve, disapprove, or partially approve a plan or amendment" with "written notice to the Council." Id. § 1854(a)(3). In the case of disapproval or partial approval, the Secretary's written notice must inform the Council of "(A) the applicable law with which the plan or amendment is inconsistent; (B) the nature of such inconsistencies; and (C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." Id. After receiving the notice, "the Council may submit a revised plan or amendment to the Secretary for review." Id. § 1854(a)(4). The Act does not limit the number of times the Secretary can send back a proposed FMP or amendment to the Council. Should "the Secretary . . . not notify a Council within 30 days of the end of the comment period" of the decision, "then such plan or amendment shall take effect as if approved." Id. § 1854(a)(3).

The Secretary is also authorized to originate FMPs and amendments in several circumstances where the Council is not so authorized. If the Council does not develop and submit a plan in "a reasonable period of time," or if the Secretary disapproves or partially approves of a plan and the Council fails to appropriately revise it, then the Secretary may prepare the FMP or "any necessary

- 10 -

amendment to such a plan." Id. § 1854(c)(1)(A)-(B). Here too, the Act requires the Secretary, but not the Council, to seek input from specified parties. The Secretary must "conduct public hearings" on the FMP that he prepared, id. § 1854(c)(2)(A), as well as "consult with the Secretary of State with respect to foreign fishing and with the . . . Coast Guard [Secretary] . . . with respect to enforcement at sea," id. § 1854(c)(2)(B). It is true the Secretary must also solicit "consideration and comment" from the relevant Council. Id. § 1854(c)(4)(A). But the Act does not require the Secretary to accept any Council-proposed revisions under these circumstances. See id. § 1854(c)(5). The Act also mandates the Secretary "publish in the Federal Register a notice stating that the [Secretary-proposed] plan or amendment is available," id. § 1854(c)(4)(B), and mandates that the Secretary take into account "any views, information, or comments submitted" in the notice and comment period, id. § 1854(c)(5).

**2. The Process of Promulgating Regulations Through Rulemaking to Implement FMPs and Amendments**

As FMPs themselves have no legally binding effect on parties, the text of the Act defines the structured processes for the Secretary, acting through his designee NMFS, to exercise his exclusive authority to bind parties through rulemaking and

promulgating implementing regulations.[3] The Councils submit to the Secretary "proposed regulations" which they "deem[] necessary" "simultaneously" with proposed FMPs or amendments. Id. § 1853(c)(1). The Councils may also propose "modifications to regulations implementing a[n] [FMP] or plan amendment" after FMP or amendment approval. Id. § 1853(c)(2). The Secretary reviews these submissions to "determine whether they are consistent with the [FMP], plan amendment, [the Act] and other applicable law." Id. § 1854(b)(1). If the Secretary concludes the proposed regulations are inconsistent with any of these four references, the Secretary notifies the Council and "provide[s] recommendations on revisions," after which the Council may submit revised proposed regulations for reevaluation by the Secretary. Id. § 1854(b)(1)(B), (2). The Act does not limit the number of times the Secretary may return proposed regulations to the Council.

If the Secretary finds the proposed regulations meet these requirements, the Act lays out the process for the Secretary

---

[3] Rulemaking under the Act also must be done in compliance with the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601 et seq., which requires agencies to consider the impact of federal regulations on small businesses by preparing regulatory flexibility analyses during rulemaking. See id. §§ 603(a), 604(a); 16 U.S.C. §§ 1854(b)-(c), 1855(e); Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 111 (1st Cir. 1997); see also Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan, 88 Fed. Reg. 56527, 56541-42 (Aug. 18, 2023) (including the Final Regulatory Flexibility Analysis in the Framework Adjustment 65 Final Rule, as required by the RFA, 5 U.S.C. § 604).

to promulgate regulations. The Secretary, acting through his designee NMFS, publishes a proposed rule in the Federal Register which contains the proposed regulations he has found to be consistent. Id. § 1854(b)(1)(A). After the close of a notice and comment period, the Secretary "shall promulgate final regulations within 30 days" in a final rule. Id. § 1854(b)(3). If the Secretary chooses to "mak[e] any revisions to the proposed regulations," he must "consult with the Council before[hand]." Id. Nothing in the Act requires the Secretary to revise the regulations in light of the Council's comments. Id. The final rule that the Secretary publishes in the Federal Register must contain "an explanation of any differences between the proposed and final regulations." Id.

Four different provisions of the Act authorize the Secretary to promulgate regulations which have not been proposed to him by a Council. First, when the Secretary prepares an FMP or amendment, the Secretary is also authorized to "propose regulations in the Federal Register" for a notice and comment period "to implement [that] plan or amendment," thus seeking input from the public. Id. § 1854(c)(6). In this circumstance, the Secretary must also "submit[]" his proposed "regulations . . . to the [relevant] Council." Id. Second, the Act vests the Secretary with general authority to "promulgate such regulations . . . as may be necessary to discharge" his "responsibility to carry out

any [FMP] or amendment approved or prepared by him" "or to carry out any other provision of [the Act]." Id. § 1855(d). Third, the Secretary is also authorized to "promulgate emergency regulations or interim measures" when "necessary to address [an] emergency or overfishing, without regard to whether a[n] [FMP] exists for such fishery." Id. § 1855(c)(1). Finally, the Secretary is authorized to "promulgate such regulations as may be necessary to carry out" the establishment of a "central registry system" for permits to fishery limited access systems. Id. § 1855(h)(2).

**B. NMFS's Promulgation, as the Secretary's Designee, of the Framework Adjustment 65 Final Rule and Implementing Regulations**

The Association's appeal seeks relief from Framework Adjustment 65 to the Northeast Multispecies FMP and the corresponding Final Rule and implementing regulations. Framework adjustment is "an expedited regulatory process" set by NMFS regulation, 50 C.F.R. § 648.90, that "allow[s] NMFS and [the Council] to respond more quickly and efficiently to fluctuations in the groundfish population." Massachusetts v. Pritzker, 10 F. Supp. 3d 208, 212-13 (D. Mass. 2014) (citing Gulf of Me. Fisherman's All. v. Daley, 292 F.3d 84, 86 (1st Cir. 2002)). Under this process, the New England Council, which is the Council with authority over the fisheries seaward of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, 16 U.S.C. § 1852(a)(1)(A), may recommend to NMFS specifications necessary to

achieve Northeast Multispecies FMP objectives, such as area-specific annual catch limits, area management boundaries, and gear restrictions, which NMFS may choose to promulgate through rulemaking. <u>See</u> 50 C.F.R. § 648.90(a)(2)(ii), (3)(i).[4]

The New England Council developed and recommended Framework Adjustment 65 as part of its annual Framework Adjustment process. Framework Adjustment 65 included five proposed measures: (1) proposed revisions to the rebuilding plan for Gulf of Maine cod stock, as NMFS had informed the Council in 2021 that the stock had made inadequate rebuilding progress under the previous plan and gave a deadline of August 2023 for revisions; (2) proposed shared U.S./Canada quotas for three stocks; (3) proposed specifications, including catch limits, for sixteen stocks; (4) proposed removal of management uncertainty buffers for two stocks; and (5) proposed temporary modifications to accountability measures for one stock. The Council preliminarily submitted Framework Adjustment 65 to the NMFS on February 22, 2023.

NMFS, acting under its delegated authority from the Secretary, responded on April 5, 2023, with a letter that outlined NMFS's concerns with the preliminary submission. In response, on

---

[4] In some circumstances, the Framework Adjustment process permits NMFS to forgo a notice and comment period when promulgating a final rule, <u>see, e.g.</u>, 50 C.F.R. § 648.90(a)(2)(vii), (c)(4)(i), but those circumstances are not present here, where NMFS went through a notice and comment period before promulgating the Framework Adjustment 65 Final Rule and implementing regulations.

April 18, 2023, the New England Council submitted a revised Framework Adjustment 65 and implementing regulations, which "incorporate[d] all the changes requested" and "addressed the concerns raised [by NMFS] with the Council's proposal for the Georges Bank cod acceptable biological catches (ABCs) for fishing years 2023 and 2024 including the rationale and impacts analysis."

NMFS staff then reviewed the revised Framework Adjustment 65 and proposed implementing regulations for consistency with the FMP and other applicable law, pursuant to § 1854(b)(1), and found it consistent. On May 11, 2023, several weeks after the Council's submission, the NMFS Regional Administrator for the Greater Atlantic Region ("Regional Administrator"), who is also a member of the New England Council, sent a Decision Memorandum to the NMFS Director recommending she approve publication of the Proposed Rule, which "propose[d] all Framework [Adjustment] 65 measures as recommended by the New England" Council. The memo stated that the Proposed Rule also sought that "[a]dditional [m]easures [n]ot [p]art of Framework [Adjustment] 65," namely regulatory corrections to text in 50 C.F.R. Part 648, be promulgated under the Secretary's § 1855(d) general regulatory authority, which were combined with Framework Adjustment 65 for rulemaking efficiency.

On May 17, 2023, the NMFS Director approved the Proposed Rule for publication in the Federal Register, and it was published

on May 31, 2023, for notice and comment. 88 Fed. Reg. 34810 (May 31, 2023). The Proposed Rule received three comments, including one from the Association, which raised essentially the same Appointments Clause arguments it has pursued in this litigation.[5] NMFS staff reviewed the comments and concluded in a June 30, 2023, Issues Advisory Memorandum from the Regional Administrator to the NMFS Director that "[n]one of the comments compel . . . disapprov[al] [of] any Council-recommended measure." On July 17, 2023, the Regional Administrator sent a Decision Memorandum to the NMFS Director recommending approval of the Final Rule. On August 3, 2023, the NMFS Director approved the Final Rule, which was published in the Federal Register on August 18, 2023. See Framework Adjustment 65 to the Northeast Multispecies Fishery Management Plan, 88 Fed. Reg. 56527 (Aug. 18, 2023) ("Final Rule").

---

[5] The Association submitted a public comment to the Framework Adjustment 65 Proposed Rule that made essentially the same Appointments Clause argument as in this suit. See Final Rule at 56540. In response, NMFS stated that the Association "misunderstands the function and authority of the Council, which . . . acts as an advisory body only: authority to issue Federal regulations to implement fishery management measures that impact fishermen is vested solely in the Secretary." Id. NMFS also stated that "Federal courts have held that fishery management councils are not considered Federal agencies for purposes of the Administrative Procedure Act" and that council members "neither occupy continuing positions nor exercise significant authority." Id.

The Final Rule and implementing regulations,[6] however, were not the same as the Proposed Rule; NMFS had made three changes. Final Rule at 56540-41. First, the Final Rule as promulgated by NMFS used § 1855(c)(2)(B) emergency power to set a different Gulf of Maine haddock acceptable biological catch ("ABC") for fishing year 2023. Id. at 56529, 56541. Under this emergency power, the Secretary "may promulgate emergency regulations [effective for 180 days] . . . to address [an] emergency or overfishing if the Council, by less than a unanimous vote, requests the taking of such action." 16 U.S.C. § 1855(c)(2)(B), (3)(B). On May 2, 2023, the Council had requested by non-unanimous vote that NMFS promulgate an emergency regulation to increase the Gulf of Maine haddock ABC from the level proposed in Framework Adjustment 65, which was 1,936 metric tons ("mt"), to 2,281 mt. Final Rule at 56529. NMFS conducted its own analysis and determined the ABC should be set at 2,515 mt, or higher than the Council's recommendation, for the 180-day period authorized by the Secretary's emergency authority. Id. The Final Rule replaced the Gulf of Maine haddock ABC to the level determined by NMFS's

---

    [6] Some measures in the Framework Adjustment 65 Final Rule were implemented through changes to regulations at 50 C.F.R. Part 648, such as the removal of a regulatory provision as part of revising the Gulf of Maine cod rebuilding plan, while most other measures in the Framework Adjustment 65 Final Rule, such as the annual catch limits for sixteen stocks, were not copied into the Code of Federal Regulations.

analysis.[7] Id. at 56541.  Second, the Final Rule included potential sector contributions and annual catch entitlements at the sector level that were not available at the time of the Proposed Rule. Id. at 56540-41.  Third, the Final Rule adjusted common pool trip limits for several fish stocks from the limits in the Proposed Rule.  Id. at 56541.

## II.

The Association, appellant/cross-appellee, is "an alliance of commercial fishermen" whose membership includes fishermen who have been economically injured by catch limit reductions in the Final Rule.  The Association sued NMFS, NMFS officials, and the Secretary (collectively, "the Secretary") in the U.S. District Court for the District of Maine on September 8, 2023, asking the court to "vacate, enjoin, and declare unlawful Framework Adjustment 65,[8] the Framework Adjustment Final Rule, and

---

[7] The Final Rule stated that it "technically approve[d] the ABC that was proposed in Framework 65, and it replace[d] the 1,936-mt [Gulf of Maine] haddock ABC in Framework 65 with an ABC of 2,515 mt for 180 days through the emergency authority provided at [16 U.S.C. § 1855(c)]."  Final Rule at 56529.  NMFS extended the emergency action after the first 180 days so that the Gulf of Maine haddock ABC remained consistent throughout fishing year 2023.  See Temporary Rule to Extend Gulf of Maine Haddock Emergency Action for the Northeast Multispecies Fishery Management Plan, 89 Fed. Reg. 1036 (Jan. 9, 2024).

[8] We lack jurisdiction over claims for relief from the Framework Adjustment itself but have jurisdiction over the Final Rule and implementing regulations, see 16 U.S.C. § 1855(f), which are the real subject of the suit.

accompanying regulations." The Association's primary argument was that the actions of the New England Council leading to Framework Adjustment 65 were so significant in framing the content of the Adjustment that the Council essentially wrote the Adjustment for the Secretary and that made the Council members "Officers of the United States." Because the Council members were not presidential appointees or appointed by heads of Departments or courts of law, the Association alleged, this violated the Appointments Clause of the U.S. Constitution. The Association also argued that other statutory provisions, not involved in any aspect of the enactment of the Final Rule or implementing regulations, violated the Appointments Clause. The appropriate remedy for the violation, it further alleged, was the invalidation of Framework Adjustment 65, the Final Rule, and all accompanying implementing regulations promulgated by the Secretary's designee, NMFS.

The parties filed cross-motions for summary judgment. In its opinion, New England Fishermen's Stewardship Association v. Raimondo, 761 F. Supp. 3d 141 (D. Me. 2024), the district court found that the Association had standing due to the injury its members suffered from the Framework Adjustment 65 Final Rule's reduced catch limits. Id. at 198-201. The amended complaint sought to permanently enjoin the Secretary from enforcing Framework Adjustment 65, its Final Rule, and accompanying regulations against the Association's members, but did not seek

injunctive relief against any other action by the Secretary. On the merits of the Association's primary argument, the district court held that the powers discussed above did not bestow significant authority on the Council members, as "only the Secretary holds the power to legally effectuate an FMP through implementing regulations," while the Councils serve an advisory "policy development role." Id. at 210. Although the district court agreed with the Association's additional argument that other provisions of the Act restricting NMFS's ability to take certain actions without prior Council approval, which were not involved in Framework Adjustment 65, were unconstitutional, it nonetheless concluded that those infirmities did not entitle the Association to its requested injunctive and declaratory relief. Id. at 212-13. The district court severed those provisions of the Act. Id. The Association argues the district court erred in severing the provisions.[9]

For the reasons stated below, we hold that the Council was merely acting as an advisor with regard to the Framework Adjustment 65 Final Rule and implementing regulations and, as such,

---

[9] The Seafood Harvesters of America, as amicus curiae in support of the Secretary and affirmance, disagrees with the Association, identifies itself as "the leading national commercial fishing organization in the United States" whose interests are "directly threaten[ed]" by appellant's claims, and argues there is no Appointments Clause violation.

was not the source of the injury to the Association's members. Accordingly, there is no basis for the award of any remedy.

### III.

This court reviews a district court's grant of summary judgment de novo.  Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 675 (1st Cir. 2023).  We also review the constitutional issue de novo.[10]  United States v. Diggins, 36 F.4th 302, 306 (1st Cir. 2022).

The Appointments Clause of the U.S. Constitution states that the President:

> shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2.  If the Council members are not officers of the United States, "the Appointments Clause cares not a whit about who named them."  Lucia v. SEC, 585 U.S. 237, 245

---

[10]  The more usual challenge to such regulations under the Act is the assertion that a regulation is unnecessary to achieve the Secretary's stated goals, inconsistent with the national standards at 16 U.S.C. § 1851, or inconsistent with other provisions of the Act.  See, e.g., Lovgren v. Locke, 701 F.3d 5, 13 (1st Cir. 2012); Daley, 127 F.3d at 110.

- 22 -

(2018) (citing <u>United States</u> v. <u>Germaine</u>, 99 U.S. 508, 510 (1878)).[11]

On the arguments made to us, we hold that the Councils are purely advisory bodies which have a defined, structured role in the Secretary's decision-making process, which "enable[s] the States, the fishing industry, consumer and environmental organizations, and other interested persons to <u>participate in</u>, and <u>advise on</u>" fishery management decisions, 16 U.S.C. § 1801(b)(5) (emphases added). Indeed, the Act may be viewed as an exercise in federalism, ensuring that the voices of States and private interests are heard in areas of exclusive federal regulation[12] -- here, the fisheries in the waters of the United

---

[11] <u>Germaine</u> held that civil surgeons who were appointed by the federal Commissioner of Pensions to make periodic examinations of pensioners and who were paid for each examination were not officers of the United States. 99 U.S. at 511-12; <u>see also</u> <u>Fin. Oversight & Mgmt. Bd. for P.R.</u> v. <u>Aurelius Inv., LLC</u>, 590 U.S. 448, 479-82 (2020) (Thomas, J., concurring) (citing <u>Germaine</u> and concurring in the judgment that members of the Financial Oversight and Management Board for Puerto Rico are not "Officers of the United States"); <u>Auffmordt</u> v. <u>Hedden</u>, 137 U.S. 310, 326-27 (1890) (citing <u>Germaine</u> and holding that a "merchant appraiser" whose "position is without tenure, duration, continuing emolument, or continuous duties" is not an officer of the United States under the Appointments Clause).

[12] States have jurisdiction to regulate fishing in the three geographical miles from their coastlines, while the Act applies to the "exclusive economic zone" of the United States, which extends from the edge of coastal State waters to 200 nautical miles seaward. <u>See</u> 48 Fed. Reg. 10605 (Mar. 10, 1983); 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1); <u>see also</u> <u>United States</u> v. <u>Maine</u>, 420 U.S. 515, 517-19 (1975) (the United States has sovereign rights over

- 23 -

States -- with most of the voting Regional Council members reflecting the interests of coastal States and commercial fishing interests in different regional waters of the United States. Yet the Secretary must independently decide to enact fishery management measures into binding federal regulations, and the Council's only role is to advise the Secretary on those decisions. Here, any injury suffered by the Association's members under the Framework Adjustment 65 Final Rule and implementing regulations flows not from the Council's advisory recommendations, but from the Secretary's independent decision to promulgate the regulations that bind the Association's members.[13]

The Association's primary argument is that the Act grants the Councils "rule-developing power" to draft FMPs and recommend regulations to the Secretary, and the New England Council exercised that power to develop Framework Adjustment 65. We disagree with the Association's characterization that the Council's structured role is anything more than advisory.

---

the seabed lying more than three geographical miles seaward from State coastlines).

[13] The Secretary has on appeal abandoned its argument to the district court that the Association lacked associational standing. The Secretary has not continued to contest the Association's standing to pursue its primary argument outlined below, but does argue it lacks Article III "standing to challenge 16 U.S.C. §§ 1854(c)(3) and (h) because these provisions are wholly irrelevant to the framework adjustment and implementing regulations at issue."

The FMPs and the final regulations differ in terms of their effect in several ways, all relevant to their impact on fishery participants like the Association's members. For one, there are key, legally significant differences in the roles assigned by Congress to the Councils and then the Secretary both as to the FMPs and as to the final regulations. FMPs are not binding on fishery participants like the Association's members, are not legally enforceable, and do not carry legally enforceable consequences for noncompliance. As explained below, only the Secretary has the rulemaking authority to promulgate regulations with the effect of law. See Anglers Conservation Network v. Pritzker, 809 F.3d 664, 667 (D.C. Cir. 2016) ("[A]ll regional Councils[] ha[ve] no authority to promulgate federal rules."). The Act simply does not have any language giving that legal status to FMPs and amendments. As said in North Carolina Fisheries Ass'n v. Gutierrez, 550 F.3d 16 (D.C. Cir. 2008), FMPs "do not themselves have any regulatory effect -- implementing regulations must also be enacted in order to effectuate them." Id. at 17; accord Arnesen v. Lutnick, 170 F.4th 965, 971 (5th Cir. 2026) ("[FMPs] or amendments are not self-executing and require the Secretary to issue accompanying regulations."). And the Councils also have no enforcement authority over violations of these regulations. It is

the federal NOAA which oversees NMFS and brings civil enforcement proceedings for violations of the promulgated regulations.[14]

Once the Secretary has promulgated regulations, only then does the Act create a cause of action, and even then, one which permits limited judicial review of only "[r]egulations promulgated by the Secretary under [the Act]" and "actions that are taken by the Secretary under regulations which implement a fishery management plan."  16 U.S.C. § 1855(f)(1)-(2) (emphases added); Goethel v. U.S. Dep't of Com., 854 F.3d 106, 113-14 (1st Cir. 2017); Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997) (the Secretary's "promulgate[d] final implementing regulations . . . are subject to judicial review").

---

[14] See, e.g., Yates v. United States, 574 U.S. 528, 533 (2015) (deputized NMFS officer issued a citation to a fishing ship for possession of undersized groupers in violation of federal fish conservation regulations under the Act, "a civil offense punishable by a fine or fishing license suspension" (citing 16 U.S.C. §§ 1857(1)(A), (G), 1858(a), (g))); Frontier Fishing Corp. v. Pritzker, 770 F.3d 58, 60-61 (1st Cir. 2014) (upholding imposition of fine and restriction of fishing days on fishing company in NOAA enforcement proceeding for violating regulations promulgated under the Act prohibiting trawling in restricted gear area); In re High Pressure Fisheries, Inc., 2024 WL 1625879, at *1-3 (NOAA Mar. 29, 2024) (enforcement action for violating 50 C.F.R. § 648.14(i)(4)(i)(A), the regulation implementing individual fishing quota possession limits of Atlantic Sea scallops, not for violating the Atlantic Sea Scallops FMP); In re Robert C. Roberge, 2015 WL 6395683, at *1, 16 (NOAA Jul. 14, 2015) (enforcement action for violating 50 C.F.R. § 648.14(k)(6)(i)(A), the regulation prohibiting fishing with specified trawl gear, not for violating the Northeast Multispecies FMP).

By contrast, Congress provided no provision allowing judicial review of the earlier, advisory steps that the Council takes. Indeed, the Act permits "judicial review [only] to the extent authorized by, and in accordance with [the Administrative Procedure Act]," 16 U.S.C. § 1855(f), which in turn permits review of "final agency action," 5 U.S.C. § 704. The Councils' actions as to amendments of FMPs are not final agency actions, but are just intermediate, advisory "step[s] toward final agency action." Anglers Conservation Network, 809 F.3d at 670. The Act also imposes a statute of limitations: authorized actions must be "filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f)(1). Our court has held this statute of limitations "cannot be sidestepped" through a claim seeking "pre-enforcement review." Goethel, 854 F.3d at 114.

The Association's argument also overstates the role of the Councils as to their advice and recommendations to the Secretary for final regulations. That role is significantly narrower, by Congressional choice, than the Council's role in developing the FMPs. The Association's arguments make much of the fact that "if the Secretary does not notify a Council within 30 days" of this judgment of the proposed FMP or amendment, it shall "take effect as if approved" under § 1854(a)(3)(C). But Congress chose not to permit Council-proposed regulations transmitted to

the Secretary under § 1854(b)(1) to bind fishery participants unless the Secretary takes the further steps needed to promulgate regulations. Thus, even if hypothetically a proposed FMP or amendment took effect by virtue of Secretarial inaction under § 1854(a)(3)(C), it would have no binding legal effect.[15]

Moreover, the final regulations promulgated by the Secretary need not be consistent with any such FMP. See Arnesen, 170 F.4th at 977 ("The Commercial Fishers [plaintiffs] also misinterpret the reach of Section 1854(b)(1) to require the regulation to be 'consistent with the fishery management plan.' . . . That provision only applies to the Secretary's review of

---

[15] Further, as the Secretary points out, the Executive Branch has long agreed that the Councils' inability to promulgate regulations makes their role purely advisory. See President Donald J. Trump Statement on Signing the Modernizing Recreational Fisheries Management Act of 2018, 2018 Daily Comp. Pres. Doc. No. 00877 (Dec. 31, 2018) ("Keeping with past practice of the executive branch, my Administration will treat the [FMPs] promulgated by the Council as advisory only; the adoption of the [FMPs] will be subject to the discretion of the Secretary of Commerce as part of the regulatory process described in . . . the [Act]."), available at 2018 WL 6839393; accord President George W. Bush Statement on Signing the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, 43 Weekly Comp. Pres. Doc. 31-32 (Jan. 12, 2007), available at 2007 WL 892712; President William J. Clinton Statement on Signing the Sustainable Fisheries Act of 1996, 2 Pub. Papers 1815 (Oct. 11, 1996), available at 1996 WL 787969. New Council members are trained that their roles are only advisory. See, e.g., Jessica Coakley, New Council Member Training: Council Process and Organization, NOAA, at 32 (Oct. 2024), https://perma.cc/YJ8K-TD25 (training new Council members that the Council's role is to "consider[] and recommend[] action" to NMFS, not to "implement" or "enforce" a recommendation).

- 28 -

regulations proposed by the Council and does not speak to the Secretary's own proposed regulations." (quoting 16 U.S.C. § 1854(b)(1))). The Act does not impose substantive constraints on the Secretary's ability to modify Council-proposed draft regulations before the Secretary promulgates final regulations. As the Framework Adjustment 65 Final Rule and implementing regulations demonstrate, the Secretary is authorized to and does exercise his other regulation-promulgation powers to effectively modify Council-proposed draft regulations.

On the facts here, the Final Rule revised the ABC for Gulf of Maine haddock, and to the level that NMFS determined, under the Secretary's § 1855(c)(2)(B) authority. See Final Rule at 56529. After Council-proposed regulations are published in the Federal Register by the Secretary for a notice and comment period, 16 U.S.C. § 1854(b)(1)(A), the Act gives the Secretary full authority to revise the substance of those regulations before "promulgat[ing] final regulations," subject only to the procedural requirement that he "consult with the [relevant] Council before making any revisions," id. § 1854(b)(3). Here, there were three changes between the Proposed Rule and the Final Rule and implementing regulations, changes which the Council did not have power to block. Final Rule at 56540-41; see, e.g., Fishing Co. of Alaska, Inc. v. Gutierrez, 510 F.3d 328, 333 (D.C. Cir. 2007) ("The Council is free to submit comments on a proposed rule (as are

others), but power to alter the rule before it becomes final rests only with the Secretary."). The Secretary's broad discretion to revise regulations allows him to respond to public input from the notice and comment period, which very well may highlight unanticipated problems that change the Secretary's judgment as to the appropriate binding regulations. We agree with the D.C. Circuit's characterization of the Councils' "post-transmittal role" after proposing draft regulations to the Secretary "as limited." Fishing Co. of Alaska, 510 F.3d at 332.

Even at the FMP stage, the Association's argument exaggerates the Council's role by downplaying the scope of the Secretary's authority to review Council-proposed FMPs and amendments. The Act gives the Secretary a different and broader role than the advisory role assigned to the Councils. The Act instructs the Secretary to "review . . . the plan or amendment to determine whether it is consistent with the national standards, the other provisions of [the Act], and any other applicable law." 16 U.S.C. § 1854(a)(1)(A). The Secretary is thus explicitly required to do his own analysis as to whether the proposal is compliant with the national standards set forth in § 1851. Id. As this court noted in Lovgren, "[c]ompliance with the" sometimes-conflicting "national standards requires balancing by the agency and the exercise of discretion and judgment." 701 F.3d

at 32 (emphasis added).[16]  The text of the Act also does not expressly limit the Secretary's authority to disapprove a Council's proposal only upon finding a conflict between that proposal and other law.  So like two of our sister circuits, we decline to read such a condition into the Act's text.  See Lofstad v. Raimondo, 117 F.4th 493, 500 (3d Cir. 2024) (holding that "the Secretary may disapprove a[n] [FMP] or amendment for any reason" because the Act "does not expressly condition [the Secretary's FMP] disapproval on a conflict with law"); Arnesen, 170 F.4th at 976 ("The Act does not 'expressly condition disapproval on a conflict with law.' . . .  To find otherwise would permit reading into the statute additional limitations on the Secretary, who is broadly entrusted under the Act to carry out its purpose." (quoting Lofstad, 117 F.4th at 500)).

Additionally, the Act requires that in "undertaking the review" of a Council-proposed FMP or amendment, the Secretary, but not the Council, must consult with specified other federal government officials, whose perspectives thus inform the

----

[16]  Among these competing considerations are how to "prevent overfishing" while also achieving "the optimum yield . . . for the [domestic] fishing industry," 16 U.S.C. § 1851(a)(1), and doing so in "fair and equitable" ways which "promote conservation," id. § 1854(a)(4).  This broadly requires the exercise of the Secretary's discretion and judgment, as Congress intended.  See New York v. Raimondo, 84 F.4th 102, 107 (2d Cir. 2023).  The Act contains no text requiring the Secretary to defer to the Council in the exercise of his judgment.

Secretary's judgment as to whether to approve, disapprove, or partially approve the Council's FMP or amendment proposal. See 16 U.S.C. § 1854(a)(2)(B)-(C).

For these reasons, and because we reject the Association's reading of the Act, we conclude controlling Supreme Court precedent requires us to hold that the advisory role that the New England Council played in the Secretary's decision to promulgate Framework Adjustment 65 Final Rule and implementing regulations was not the source of the injuries alleged by the Association's members. Our conclusion follows from the Supreme Court's most recent Appointments Clause cases as well as earlier cases.

In Kennedy v. Braidwood Management, Inc., 606 U.S. 748 (2025), the precise Appointments Clause issue was admittedly different: whether members of the Preventive Services Task Force ("Task Force") were "inferior" or "principal" officers.[17] Id. at 754. The Court held that Task Force members were "inferior" officers who were properly appointed by a principal officer, the Secretary of Health and Human Services ("HHS"), so there was no Appointments Clause violation. Id. The Task Force there, originally created in 1984 and codified in 1999, is an entity

---

[17] The Association does not contest that the NMFS director, the NOAA Assistant Administrator for Fisheries, is a duly appointed inferior officer.

within HHS, which "issues public recommendations about preventive healthcare services -- for example, cancer and diabetes screenings." Id. at 753-55. The Affordable Care Act of 2010 ("ACA") required health insurers across the country to cover the services the Task Force recommended with an "A" or "B" grade at no cost to the insured, making the scope of the Task Force's responsibilities national. Id. at 756-57. The ACA directed the Secretary of HHS to establish a period of not less than one year between the Task Force's issuance of an "A" or "B" grade recommendation of a service and when insurers must cover that service without cost sharing. Id. at 757. During that period, the Secretary of HHS can review that recommendation and block it from taking effect. Id. The Court explained that Task Force members were "nationally recognized experts in prevention, evidence-based medicine, and primary care . . . includ[ing] researchers, professors, and practicing physicians with experience and expertise in public health and across a wide range of medical specialties." Id. at 755 (internal quotation marks and citation omitted).

Most importantly for our analysis, the Court stated that "[b]efore 2010," when the ACA was enacted, "members of the Preventive Services Task Force were not officers at all," because "[t]he Task Force was an advisory body" where "members made only non-binding recommendations." Id. at 761 (emphases added). We

- 33 -

take it that a crucial component of Braidwood's analysis was the Task Force's ability to directly bind insurers. Id. at 761-62. Had the case required the HHS Secretary to take some affirmative action before its recommendations gained the force of law, we doubt that Braidwood would have been able to challenge the Task Force's structure. Like the Task Force in Braidwood as it existed before 2010, the Councils here are advisory bodies which lack the power to effectuate rules and regulations with legally binding effects.[18]

The Association responds that the lack of a statutory provision that enacts Council-proposed regulations as legally binding in the face of Secretarial inaction "hardly matters" given that Council-proposed FMPs and amendments can "take effect as if approved" after Secretarial inaction under § 1854(a)(3)(C). Our earlier explanation disposes of this argument, which amounts to an argument that we should disregard different textual language choices in the Act as "hardly matter[ing]." That "argument flips the rule that '[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate.'" Bartenwerfer v. Buckley, 598 U.S. 69, 78 (2023) (alteration in original)

---

[18] The case here might be different if Council action could become legally binding simply through the Secretary's inaction, as in Braidwood, 606 U.S. at 766-67.

- 34 -

(internal quotation marks omitted) (quoting <u>Badgerow</u> v. <u>Walters</u>, 596 U.S. 1, 11 (2022)).

Our holding is also consistent with <u>Freytag</u> v. <u>Commissioner</u>, 501 U.S. 868 (1991), where there was no question that the U.S. Tax Court Special Trial Judge ("STJ") whose appointment was challenged had harmed the plaintiff in the tax proceedings below through adverse rulings. The initial question, then, was whether the STJ who committed those harms served as an employee or inferior officer. <u>Id.</u> at 880-81. Those tax proceedings occurred under 26 U.S.C. § 7443A(b)(4), which meant the STJ could only recommend a disposition of the case which then had to be adopted by a higher official to take effect. <u>Id.</u> at 881. The government argued that this advisory feature made the STJ an employee for purposes of the case. <u>Id.</u> The Court rejected the argument that STJs were employees first by determining that the STJ's ability to make evidentiary and administrative record-building decisions made the STJ an inferior officer despite the inability to render a final disposition in § 7443A(b)(4) cases. <u>Id.</u> at 881-82. The Association's argument by analogy that the Councils here similarly "critically shape" the administrative record used by the Secretary in evaluating the Council's proposals both fails and mischaracterizes the text of the Act.[19] Far from

_____

[19] The Association's argument is not improved by its citation to <u>Lucia</u> v. <u>SEC</u>, 585 U.S. 237 (2018), another Appointments Clause

restricting the Secretary to the Council-developed record, the text of the Act requires the Secretary to "take into account the information, views, and comments received from interested persons" during the notice and comment period, 16 U.S.C. § 1854(a)(2)(A), and, as described, to consult with other federal secretaries, see id. § 1854(a)(2)(B)-(C), during the Secretary's review of a Council-proposed FMP.[20] The Fifth Circuit has reached the same conclusion. See Arnesen, 170 F.4th at 978 ("[W]e read the Act to empower the Secretary to consider other information in reviewing and revising [Council-proposed] [FMPs], amendments, or [regulations]; the Secretary is not confined to solely the Council's proposals nor the Council's basis for its proposals.").

We also note key distinctions between this case and both Lucia and Freytag. Lucia made clear that an official may be an

---

case involving officials serving judicial functions. Lucia stated that "Freytag says everything necessary to decide this case" and, following the Freytag analytical framework, held that SEC Administrative Law Judges ("ALJs") were inferior officers who were appointed by SEC employees in violation of the Appointments Clause. Id. at 241, 247. The Court in Lucia said that the ALJs' authority to rule on the admissibility of evidence was also the authority to "critically shape the administrative record." Id. at 248.

[20] We also note that Freytag v. Commissioner held that because each STJ's appointment was made by the Chief Judge of the Tax Court, there was no violation of the language of the Appointments Clause pertaining to "Courts of Law." 501 U.S. 868, 891-92 (1991). Unlike Freytag, our case does not involve the "Courts of Law" language of the Appointments Clause and that provides reason to doubt that in this different context, any analogy to creation of records as in courts of law is a useful analysis.

officer even if decisions made by the official are subject to review, as long as these decisions can themselves become final and have binding effect. See Lucia, 585 U.S. at 248-49 (reasoning, in part, that the ability of an ALJ to render a decision that would become final and binding if the SEC chose not to review the decision supported the conclusion that the ALJ was an "officer"). Here, even Secretary inaction (which would allow a Council-developed FMP to become final) is insufficient to give binding effect to a Council-developed FMP. Rather, as we have explained, the Secretary must take the additional affirmative step of adopting binding regulations that can be shaped through the Secretary's exercise of substantial discretion. And as the Court noted in Financial Oversight & Management Board for Puerto Rico v. Aurelius Investment, LLC, 590 U.S. 448 (2020), Freytag was also concerned with manipulations of appointments in order to avoid the executive accountability required under the Appointments Clause, which is not an issue here. Id. at 457. Rather, the Council's structure ensures that interested State stakeholders have an opportunity to advise a constitutionally appointed officer, the Secretary, who can be held accountable for his fishery management decisions.

The Association makes the additional argument that in evaluating an Appointments Clause claim, courts must consider all of an official's powers, including here two Act subsections, 16

U.S.C. § 1854(c)(3) and (h),[21] which were uninvolved in the enactment of the Framework Adjustment 65 Final Rule and implementing regulations. The argument is based on its view of some language in Freytag and Lucia but also fails. The Freytag Court held that STJs were inferior officers even if some of their trial-conducting powers were insufficient to constitute significant authority and were only the powers of employees. 501 U.S. at 881-82. The Freytag Court reasoned that was because the STJ did retain final authority to decide cases under subsections (b)(1), (2), and (3), which were not involved in the pending case. Id.; see also Lucia, 585 U.S. at 247 n.4. Based on this characterization of Freytag and Lucia, the Association argues it is entitled to relief based on these two uninvolved subsections.

Even on this understanding of Freytag and Lucia, the case before us is meaningfully distinguishable. Here, the harm from the Framework Adjustment 65 Final Rule and implementing regulations cannot be said to have been caused by the Council's

---

[21] Section 1854(c)(3), which requires any Secretary-prepared FMP with a limited access system to get the approval of a majority of the relevant Council's voting members, was not involved here, as Framework Adjustment 65 was not prepared by the Secretary and does not contain a limited access system. Indeed, the Secretary represents that this provision has never been invoked in the fifty years since the Act's passage. Section 1854(h), which requires a three-quarters majority of a Council to approve the Secretary's repeal or revocation of an FMP, is also inapplicable as the Secretary did not seek to repeal or revoke an FMP here. The Secretary reports, and the Association does not contest, that this provision has never blocked a Secretarial proposal.

actions at all: not by the Council's advisory actions, as discussed above, nor by the two uninvolved subsections, which the Association itself describes as "not even at issue" in Framework Adjustment 65.  That makes the Association unlike the plaintiffs in Freytag or Lucia, where the challenged official's actions clearly caused the plaintiff harm in agency adjudication proceedings, even if the official caused the harm using only powers of an employee.  Without any Council-caused injury, we have no reason to consider the uninvolved subsections of the Act.[22]

It is true that two of our sister circuits, on different briefing, reached the merits of similar Appointments Clause claims concerning these two subsections.  See Arnesen, 170 F.4th at 975; Lofstad, 117 F.4th at 499.  In neither case did the circuits approve injunctive relief against the challenged amendments to FMPs.  Indeed, the courts differed as to the import of their chosen remedies in severing these two subsections, which they referred to as "pocket veto" authorities.  The Fifth Circuit chose to sever these two subsections and then granted judgment for the government. Arnesen, 170 F.4th at 975, 979-80.  The Third Circuit, in contrast, applied severance and granted judgment for the plaintiffs.

---

[22]  As we conclude the Association's final argument based on the two uninvolved subsections fails, we need not address the Secretary's independent argument that the Association lacks standing to bring this argument even if it has standing to bring its primary argument.

<u>Lofstad</u>, 117 F.4th at 501-02.[23]  <u>Lofstad</u>'s standing analysis relied in part on past Third Circuit caselaw holding that a "litigant need not show direct harm or prejudice caused by an Appointments Clause violation . . . .  Such harm is presumed."  <u>Id.</u> at 497 (quoting <u>Cirko</u> v. <u>Comm'r of Soc. Sec.</u>, 948 F.3d 148, 154 (3d Cir. 2020)).  The First Circuit has not adopted any such rule.  Further, the Association itself acknowledges that the severance remedy path taken by the Third and Fifth Circuits, which was also the district court's remedy here, would not redress the injury that the Association's members are suffering.

## IV.

For the foregoing reasons, the judgment below is **affirmed in part** as to its denial of injunctive and declaratory relief and **reversed in part** and **vacated** as to its severing of 16 U.S.C. § 1854(c)(3) and (h).

---

[23] <u>Lofstad</u> v. <u>Raimondo</u> also severed 16 U.S.C. § 1856(a)(3)(b).  117 F.4th 493, 499, 501 (3d Cir. 2024).  The Association did not challenge that uninvolved provision, which concerns delegation of fishery management to state governments, in either the district court or on appeal.